# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AYLA MARIE DAVIS, CHRISTOPHER
JOHN DAVIS, E.D. (a minor, by and through
AYLA MARIE DAVIS), GUY LEON
"BUCK" DAVIS, TERESITA RUTH DAVIS,
STEPHEN WENCESLAO EVANS, JESSICA
FARLEY, CECELIA A. "CELIA" HANLEY,
EDWARD HANLEY, KATHERINE KEITH
"KATE" HANLEY, PATRICK HANLEY,
OBDULIA PRICILA LOPEZ MONCADA,
MATTHEW MONCADA, ALEXANDRA
AGUILAR, DANIELA MONCADA, MIRIAM
LOPEZ, P.M. (a minor, by and through
MONICA MONCADA), SAMUEL
MONTALBANO, DEBORAH SUE
"DEBBIE" WILSON, AMI NEIBERGER,
CHRISTOPHER T. "CHRIS" NEIBERGER
(ESTATE), ERIC NEIBERGER, MARY
NEIBERGER, RICHARD NEIBERGER,
ROBERT NEIBERGER, LESLIE KAY
HARDCASTLE, SHERRI CAMILLE
HOILMAN, JONI ARIEL REEVES LITTLE,
JAMES L. REEVES, JARED DILLON
REEVES, JOSHUA "JOSH" REEVES
(ESTATE), J.R. (a minor, by and through
LESLIE HARDCASTLE), W. JEAN REEVES,
PAMELA "PAM" THRALL, BRITTANI
HOBSON, DEREK STEPHENS, KATHLEEN
STEPHENS, RHETT DEE STEPHENS,
SUMMER STEPHENS, and TRENT
STEPHENS,

        Plaintiffs,

   v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Case No.1:16-cv-02193-EGS

## SECOND AMENDED COMPLAINT

### I.    NATURE OF THE ACTION

1.     This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A (hereinafter "FSIA") and California state law for wrongful death, personal injury, and related torts, by the estates and families of United States nationals and/or members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were killed or injured by the Islamic Republic of Iran ("Iran") and/or its agents in Iraq from 2006 to 2009.

2.     Iran's aforementioned agents included the Islamic Revolutionary Guard Corps ("IRGC"), a U.S.-designated Foreign Terrorist Organization; the international branch of IRGC, the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"), a U.S.-designated Specially Designated Global Terrorist; the Iraqi Jaysh al-Mahdi and the associated Jaysh al-Mahdi "Special Groups"; and the Lebanese Hezbollah (herein, "Hezbollah"), a U.S.-designated Foreign Terrorist Organization.

3.     The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act.

4.     The United States designated Hezbollah a Specially Designated Terrorist on January 25, 1995. Hezbollah was designated a Foreign Terrorist Organization by the United States on October 8, 1997, and it has retained that designation since that time. Hezbollah was designated a Specially Designated Global Terrorist by the United States on October 31, 2001, pursuant to Executive Order 13224 ("E.O. 13324").

### II.    JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter and over Defendant pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject-matter and

personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees, and agents.

6.      28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury, and related torts.

7.      California state law recognizes a private right of action for intentional infliction of emotional distress, and California Code of Civil Procedure §§ 377.60–377.62 creates a private right of action for wrongful death. 28 U.S.C. § 1605A(a)(1) and 28 U.S.C. § 1332(a)(2) afford this Court jurisdiction over state law claims against Iran where the matter in controversy exceeds $75,000, as it does here.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

## III.    **DEFENDANT**

9.      At all times relevant to this Complaint, Defendant Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)).

10.      Iran provided material support and resources for the commission of acts of extrajudicial killing, within the meaning of 28 U.S.C. § 1605A, including the terrorist attacks in which Plaintiffs were killed, injured, or maimed, and performed actions that caused the terrorist attacks and the harm to Plaintiffs herein.

11.      The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through its IRGC and its

Lebanese proxy, Hezbollah.

12.     The IRGC is comprised of five branches (Ground Forces, Air Force, Navy, Basij militia, and IRGC-QF), in addition to a counterintelligence directorate and representatives of the Supreme Leader. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

13.     Iran was deeply involved in the conflict in Iraq following America's invasion to topple the dictator Saddam Hussein in 2003, working to thwart subsequent U.S. efforts to stabilize the country through Iranian provision of training, weaponry, and other equipment to militant groups. This fact has long been acknowledged by all informed observers. As but one example among many, according to the U.S. State Department's 2005 Country Reports on Terrorism: "The IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq … Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

14.     The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapons systems, including military grade Explosively Formed Penetrators ("EFPs"), anti-tank guided missiles, and various rockets, such as the Fajr-5.

15.     EFPs were used to injure and kill numerous Plaintiffs or Plaintiffs' family members. Such bombs are sometimes referred to as "improvised explosive devices" ("IEDs"). Applying this term to EFPs is somewhat of a misnomer, though, because in reality, EFPs were not "improvised." They were professionally manufactured and specifically designed by Iran and its agents to target U.S. and Coalition Forces' specialized armor.

16.     In October 2007, the IRGC-QF was designated a Specially Designated Global Terrorist ("SDGT") pursuant to E.O. 13324 for its terrorism-related activities. The U.S. Treasury Department's press release announcing the designation noted that:

> The Qods Force has had a long history of supporting Hizballah's [sic] military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah [sic] in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah [sic] fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah [sic] and has assisted Hizballah [sic] in rearming in violation of UN Security Council Resolution 1701.
>
> *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

(Emphasis added.)

17.     In April 2019, the IRGC, including its Qods Force, was designated a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, for its terrorism-related activities. The President's statement announcing the designation noted that:

> This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign.
>
> This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments.

## IV. IRAN'S MATERIAL SUPPORT TO ACTS OF TERRORISM IN IRAQ 2006-2011

### a. ISLAMIC REVOLUTIONARY GUARD CORPS - QODS FORCE IN IRAQ

18.     Shortly after Iran's revolution of 1979, Ayatollah Ruhollah Khomeini instituted what became known as the IRGC to forestall any backsliding in implementing his vision for a theocratic government in the Islamic Republic of Iran.

19.     A subsidiary of the IRGC, IRGC-QF is responsible for its international operations, including training militant groups to support the revolution through insurgency and terrorism.

20.     IRGC-QF is led by General Qasem Soleimani, a direct report of the second Supreme Leader of Iran, Ayatollah Sayyid Ali Hosseini Khamenei.

21.     Among Iran's foreign activities, its campaign in Iraq figures prominently. Its first militant activities directed toward Iraq stretch back to the Iran-Iraq War in the 1980s. In that conflict, the Shi'a Muslim regime in Iran sought to undermine Saddam Hussein's largely Sunni Muslim government in a variety of ways, including by supporting Shi'a political groups in Iraq.

22.     Meanwhile, beginning in the 1980s, the IRGC shaped the development and military capabilities of Hezbollah, a militant Shi'a political party that wanted to oust Israeli forces from Southern Lebanon. Despite this initial geographic focus, Hezbollah has undertaken an increasing number of activities—both licit and illicit—outside of Lebanon, including in the Greater Middle East, West Africa, Latin America, and even the United States. Iran is Hezbollah's primary benefactor, providing upwards of $200 million each year in support, in addition to weapons, training, intelligence, and logistical assistance. As the relationship between IRGC and Hezbollah grew, Hezbollah reciprocated by executing terrorist missions against Israeli and American targets at Iran's request, offering Iran "reasonable deniability" after the fact. Iran's unbroken support since the early 1980s is enough to prompt Hezbollah to frequently act in service of Iranian foreign policy

interests in Lebanon, as well as in other regions of the world, including in Iraq.

23.     Iran has used both the IRGC-QF and Hezbollah as primary mechanisms to intervene in Iraq.

24.     When the Saddam regime fell in early 2003, Iran was provided with an opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region. America's post-invasion presence in Iraq threatened Iran's opportunities, however, and reinforced the long-held Iranian desire to push the United States out of the Gulf region.

25.     On May 1, 2003, President Bush declared that "major combat operations in Iraq have ended."

26.     On May 23, 2003, the Coalition Provisional Authority, which was established as Iraq's interim government, disbanded the Iraqi military forces.

27.     The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003, to maintain "security and stability." S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

28.     Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. peacekeeping efforts in Iraq as a potential threat and set out to target Coalition Forces.

29.     Rather than directly engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

30.     From 2004 to 2011, Iran was responsible for an increase of lethal attacks on U.S. forces in Iraq and provided militants with the capability to assemble explosives designed to defeat

armored vehicles.

31.     The IRGC-QF, in concert with Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shi'a militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

32.     One such militant group, cultivated, armed, trained, and supported by IRGC-QF, was Jaysh al-Mahdi, the armed wing of Muqtada al-Sadr's Office of the Martyr Sadr and its associated "Special Groups."

### b.   JAYSH AL-MAHDI AND ASSOCIATED "SPECIAL GROUPS"

33.     Jaysh al-Mahdi's founding was announced in July 2003, by radical Shi'a cleric Muqtada al-Sadr.

34.     Jaysh al-Mahdi received support and training from the IRGC.

35.     In the summer of 2003, shortly before Mr. al-Sadr announced Jaysh al-Mahdi's formation, he and three of his advisors visited Tehran. While in Tehran, Mr. al-Sadr reportedly met with the Supreme Leader of Iran, as well as the heads of IRGC and IRGC-QF.

36.     Following this trip, Iran began training large numbers of Jaysh al-Mahdi fighters.

37.     In April 2004, Jaysh al-Mahdi led the first major armed confrontation from the Shi'a community against U.S.-led forces in Iraq.

38.     After American and Iraqi forces inflicted large casualties on Jaysh al-Mahdi in the battle of Najaf in 2004, Mr. al-Sadr permitted the formation of Jaysh al-Mahdi "Special Groups" with enhanced capabilities to attack American and Coalition forces, while the remainder of Jaysh al-Mahdi would focus on anti-Sunni violence and other criminal activities.

39.     This resulted in a realignment of leadership where local commanders of Jaysh al-Mahdi Special Groups operated in association with, yet somewhat autonomously of, Jaysh al-

Mahdi, and received their training, weapons, and operational direction directly from Hezbollah and the IRGC-QF.

40.     IRGC-QF funding and equipment for Special Groups reached an estimated $750,000 to $3 million per month by August 2007.

41.     Asa'ib Ahl al-Haq is a Jaysh al-Mahdi Shi'a Special Group supported by Hezbollah and the IRGC-QF that has conducted terrorist attacks against Americans and Iraqis alike.

42.     At all relevant times, Asa'ib Ahl al-Haq received significant funding, training, and arms from Iran, and closely coordinated with Iran's IRGC-QF and Hezbollah.

43.     In particular, Hezbollah operative Ali Musa Daqduq, at the direction of IRGC-QF, provided training to Asa'ib Ahl al-Haq terrorists as part of his direction of Jaysh al-Mahdi operations in Iraq.

44.     One of Asa'ib Ahl al-Haq's leaders, Qais Khazali, who commanded one or more Jaysh al-Mahdi Special Groups, traveled to Iran in 2006 and met with IRGC-QF leadership as well as Supreme Leader Ayatollah Khamenei to discuss Iranian support for Jaysh al-Mahdi Special Groups. Iranian support for the Special Groups subsequently grew, and the provision of this support became more direct.

45.     From 2006 to 2011, Asa'ib Ahl al-Haq operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF.

46.     At the same time as Asa'ib Ahl al-Haq was carrying out terror attacks on U.S. and Coalition Forces, Sadr, in 2008, rebranded Jaysh al-Mahdi as the "Promised Day Brigades," which operated as a Special Group of his own whose purpose was to carry out attacks against Americans in Iraq.

47.     The Promised Day Brigades also received funding, training, and weapons from the

IRGC-QF and Hezbollah.

48.     The Promised Day Brigades actively targeted U.S. forces in an attempt to disrupt security operations and further destabilize Iraq. For example, on June 28, 2011, the Promised Day Brigades issued a statement claiming responsibility for ten mortar and Katyusha rocket attacks against U.S. military convoys, in which U.S. officials confirmed that three U.S. troops were killed.

### c.  EXPLOSIVELY FORMED PENETRATORS ("EFPs")

49.     From 2004 to 2011, IRGC-QF and Hezbollah provided Jaysh al-Mahdi and its Special Groups, including Asa'ib Ahl al-Haq, with a variety of weapons used to target Americans engaged in their post-2003 peacekeeping mission.

50.     These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions ("IRAMs"), as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, RPG launchers, and other small arms.

51.     One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing, and deployment of EFPs.

52.     As noted above, the EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor.

53.     EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

54.     First used by Hezbollah against Israeli armor in Lebanon, EFPs are known as shaped charges, usually made with a manufactured concave copper disk and a High Explosive packed behind the liner.

55.     In Iraq, EFPs were often triggered by a passive infra-red device that set off the explosion within the EFP's casing, forcing the copper disk forward and turning it into a high velocity slug that could pierce most military-grade armor. After an EFP pierces even an up-armored Humvee, the slug disperses shards of the Humvee's steel and Teflon, potentially blows the vehicle's doors off of their hinges due to the ensuing pressure wave, and possibly ignites the vehicle's fuel.

56.     Inflicting this damage requires precision craftsmanship of the EFP. The copper disk must be milled to a specific thickness and angle. If the depth of the disk is too thick or too thin, or if the curvature of the disk is incorrect, then the slug may be unable to form or may split into multiple pieces during flight. As a result, the slug may be unable to penetrate the target or may miss it entirely. Moreover, the disk must consist of copper rather than other metals whose melting points are not conducive to proper formation of an effective slug. The explosive too must be of a certain type and strength in order to shape and propel the slug fast enough to cut through a Humvee's armor.

57.     To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

58.     EFPs are far more sophisticated than homemade explosive devices such as traditional IEDs, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Jaysh al-Mahdi Special Groups have deployed them against U.S. and Iraqi civilians as well.

59.     Both Iran and Hezbollah (at the direction of Iran) were instrumental to the use of EFPs in Iraq beginning in 2004. From 2004 to 2011, Iran facilitated the smuggling of these

components into Iraq along well-established, yet clandestine supply lines for assembly into the finished weapons.

60.    Meanwhile, IRGC-QF and Hezbollah conducted trainings in Iraq, Iran, and Lebanon for Iraqi Shi'a militant leaders, including Jaysh al-Mahdi and its Special Groups, in the effective use of EFPs.

61.    In 2006, the U.S. State Department's Country Reports on Terrorism documented Iran's efforts to provide terrorists with lethal EFPs to ambush and murder U.S. and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. *These individuals then passed on this training to additional militants in Iraq.*

(Emphasis added.)

62.    Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force – Iraq stated: "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."

63.    Brigadier Gen. Kevin Bergner commented on Iranian funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq […] Iran's Quds Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. […] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in

funding and arming extremist groups in Iraq…. The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms -- including explosively formed penetrators, the most deadly form of improvised explosive device -- and funding from Iran. They also have received planning help and orders from Iran.

64.     In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, commented that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers -- IEDs. And we have an aggressive campaign to counter those IEDs . . . . *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

65.     According to the U.S. State Department's 2007 Country Reports on Terrorism:

Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC)-Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to militants inside Iraq, a "train- the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

66.     Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that: "Iranian Islamic Revolutionary Guard Corps - Qods Force (IRGC- QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that

Iran will cease lethal aid."

67.     These observations continued in 2008. According to the U.S. State Department's

2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan …
> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

68.     In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq

were participants in an internationally recognized peacekeeping mission, Iran embarked on a

policy of terrorism, murder, kidnapping, and torture to thwart those efforts.

69.     Iran opposed U.S. peacekeeping efforts and initiated acts of international terrorism

against American military personnel, Coalition Forces, and Iraqi citizens with the goals of

destabilizing Iraq and increasing Iranian influence in that country.

70.     Iran, through its authorized agents and instrumentalities acting within the scope of

their employment, agency, and direction from Iran, provided material support and/or resources

that facilitated acts of torture, extrajudicial killing, and hostage taking that caused personal injury

or death to more than one thousand Americans in Iraq.

71.     In particular, Iranian agents developed and cultivated Jaysh al-Mahdi and its

associated Special Groups, providing training in the use of EFPs, IRAMs, rocket-propelled grenades, sniper fire, and mortars, as well as operational and computer security.

## V.   THE PLAINTIFFS

**ATTACK 1: OCTOBER 4, 2006 – BAGHDAD, IRAQ**

### a.   The Richardson Family

72.     Rod Richardson enlisted in the U.S. Marine Corps and served in Vietnam. Mr. Richardson later re-entered the Marine Corps and was commissioned as an officer, serving in Iraq as a Marine Corps officer and later as a civilian security contractor.

73.     On October 4, 2006, while working as a civilian contractor for Falcon Security, Rod Richardson was killed during a complex attack by Jaysh al-Mahdi in the Adhamiyah District in Baghdad, Iraq. The complex attack included use of an EFP planted and detonated by Jaysh al-Mahdi.

74.     The weapon used to kill Rod Richardson was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

75.     Rod Richardson was a citizen of the United States when he was killed in Iraq.

76.     Plaintiff Pamela Thrall is a citizen of the United States and domiciled in the State of Oklahoma. She is the sister of Rod Richardson.

77.     As a result of the attack and Rod Richardson's death, Pamela Thrall has experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Rod Richardson's society, companionship, comfort, advice, and counsel.

**ATTACK 2: MAY 8, 2007 – SALMAN PAK, IRAQ**

    **b.  The Stephens Family**

78.    Blake Stephens served in the U.S. Army with the 3rd Brigade Combat Team, 3rd Infantry Division.

79.    On May 8, 2007, Blake Stephens was killed by an EFP planted and detonated by Jaysh al-Mahdi near Salman Pak, a town 18 miles south of Baghdad. He was 25 years old.

80.    The weapon used to kill Blake Stephens was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

81.    Blake Stephens was a citizen of the United States when he was killed in Iraq.

82.    Plaintiff Kathleen Stephens is a citizen of the United States and domiciled in the State of Idaho. She is the mother of Blake Stephens.

83.    Plaintiff Trent Stephens is a citizen of the United States and domiciled in the State of California. He is the father of Blake Stephens.

84.    Plaintiff Summer Stephens is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Blake Stephens.

85.    Plaintiff Rhett Stephens is a citizen of the United States and domiciled in the State of California. He is the brother of Blake Stephens.

86.    Plaintiff Brittani Hobson is a citizen of the United States and domiciled in the State of Idaho. She is the sister of Blake Stephens.

87.    Plaintiff Derek Stephens is a citizen of the United States and domiciled in the State of Idaho. He is the brother of Blake Stephens.

88.    As a result of the attack and the death of Blake Stephens, Plaintiffs Kathleen Stephens, Trent Stephens, Summer Stephens, Rhett Stephens, Brittani Hobson, and Derek

Stephens have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Blake Stephens's society, companionship, comfort, advice, and counsel.

**ATTACK 3: JULY 4, 2007 – BAGHDAD, IRAQ**

### c. The Davis Family

89.     Steven A. Davis served in the U.S. Army in Iraq as part of the 2nd Battalion, 12th Infantry regiment, 2nd Brigade Combat Team, 2nd Infantry Division.

90.     On July 4, 2007, Steven A. Davis was killed in the Al Rashid District in Baghdad, Iraq. Steven A. Davis was killed by a shape charge grenade thrown by Jaysh al-Mahdi. He was 23 years old.

91.     The attack that killed Steven A. Davis was Iranian-funded and carried out by Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

92.     Steven A. Davis was a U.S. citizen when he was killed in Iraq.

93.     Plaintiff Ayla M. Davis is a citizen of the United States and domiciled in the State of North Carolina. She is the widow of Steven A. Davis.

94.     Plaintiff E.D., by and through her next friend Ayla M. Davis, is a citizen of the United States and domiciled in the State of North Carolina. She is the minor daughter of Steven A. Davis.

95.     Plaintiff Guy L. Davis is a citizen of the United States and domiciled in the State of North Carolina. He is the father of Steven A. Davis.

96.     Plaintiff Teresita R. Davis is a citizen of the United States and domiciled in the State of North Carolina. She is the mother of Steven A. Davis.

97.     Plaintiff Christopher J. Davis is a citizen of the United States and domiciled in the State of Virginia. He is the brother of Steven A. Davis.

98.     As the result of the attack and Steven A. Davis's death, Plaintiffs Ayla M. Davis, E.D., a minor, Guy L. Davis, Teresita R. Davis, and Christopher J. Davis have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Steven A. Davis's society, companionship, comfort, advice, and counsel.

**ATTACK 4: AUGUST 6, 2007 – BAGHDAD, IRAQ**

### d.  The Neiberger Family

99.     Christopher Neiberger served in the U.S. Army with the 18th Infantry Regiment, 2nd Brigade Combat Team, 1st Infantry Division.

100.     On August 6, 2007, Christopher Neiberger was killed by an EFP planted and detonated by Jaysh al-Mahdi in the Al Rashid District in western Baghdad. He was 22 years old.

101.     The weapon used to kill Christopher Neiberger was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

102.     Christopher Neiberger was a citizen of the United States when he was killed in Iraq.

103.     Plaintiff Mary Neiberger is a citizen of the United States and domiciled in the State of Florida. She is the mother of Christopher Neiberger.

104.     Plaintiff Richard Neiberger is a citizen of the United States and domiciled in the State of Florida. He is the father of Christopher Neiberger.

105.     Plaintiff Ami Neiberger is a citizen of the United States and domiciled in the State of Virginia. She is the sister of Christopher Neiberger.

106.     Plaintiff Robert Neiberger is a citizen of the United States and domiciled in the District of Columbia. He is the brother of Christopher Neiberger.

107.     Plaintiff Eric Neiberger is a citizen of the United States and domiciled in the State of Florida. He is the brother of Christopher Neiberger.

108.     Plaintiff Eric Neiberger brings an action individually and on behalf of the Estate of Christopher Neiberger, as its legal representative.

109.     As a result of the attack and the death of Christopher Neiberger, Plaintiffs Mary Neiberger, Richard Neiberger, Ami Neiberger, Robert Neiberger, and Eric Neiberger have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Christopher Neiberger's society, companionship, comfort, advice, and counsel.

**ATTACK 5: SEPTEMBER 22, 2007 – BAGHDAD, IRAQ**

  **e.   The Reeves Family**

110.     Joshua Reeves served in the U.S. Army with the 16th Infantry Regiment, 4th Brigade Combat Team, 1st Infantry Division.

111.     On September 22, 2007, Joshua Reeves was killed by an EFP planted and detonated by Jaysh al-Mahdi outside of FOB Rustamiyah. He was 26 years old.

112.     The weapon used to kill Joshua Reeves was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

113.     Joshua Reeves was a citizen of the United States when he was killed in Iraq.

114.     Plaintiff Leslie Hardcastle is a citizen of the United States and domiciled in the State of Tennessee. She is the widow of Joshua Reeves.

115.     Plaintiff J.R., a minor represented by his legal guardian, Leslie Hardcastle, is a citizen of the United States and domiciled in the State of Tennessee. He is the son of Joshua Reeves.

116.     Plaintiff W. Jean Reeves is a citizen of the United States and domiciled in the State of Georgia. She is the mother of Joshua Reeves.

117.     Plaintiff James Reeves is a citizen of the United States and domiciled in the State

of Georgia. He is the father of Joshua Reeves.

118.     Plaintiff Jared Dillon Reeves is a citizen of the United States and domiciled in the State of Georgia. He is the brother of Joshua Reeves.

119.     Plaintiff Joni Ariel Reeves Little is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Joshua Reeves.

120.     Plaintiff Sherri C. Hoilman is a citizen of the United States and domiciled in the State of Florida. She is the sister of Joshua Reeves.

121.     Plaintiff Leslie Hardcastle brings an action individually and on behalf of the Estate of Joshua Reeves, as its legal representative.

122.     As a result of the attack, and the death of Joshua Reeves, Plaintiffs Leslie Hardcastle, J.R., a minor, W. Jean Reeves, James Reeves, Jared Dillon Reeves, Joni Ariel Reeves Little, and Sherri C. Hoilman have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Joshua Reeves's society, companionship, comfort, advice, and counsel.

## ATTACK 6: MARCH 29, 2008 – BAGHDAD, IRAQ

### f.   The Hanley Family

123.     Patrick Hanley served in the U.S. Army with the 2nd Battalion, 16th Infantry Regiment.

124.     On March 29, 2008, Patrick Hanley was serving in the U.S. military in Iraq.

125.     Patrick Hanley was injured by an EFP planted and detonated by Jaysh al-Mahdi between the New Baghdad District Advisory Council and COP Cajimat. He was 31 years old.

126.     The weapon used to injure Patrick Hanley was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

127.     As a result of the attack, Patrick Hanley has lost his left arm and suffers from post-traumatic stress disorder (PTSD), as well as other physical and psychological injuries.

128.     Plaintiff Patrick Hanley is a citizen of the United States and domiciled in the State of Virginia.

129.     Plaintiff Katherine Hanley is a citizen of the United States and domiciled in the State of Virginia. She is the mother of Patrick Hanley.

130.     Plaintiff Edward Hanley is a citizen of the United States and domiciled in the State of Virginia. He is the father of Patrick Hanley.

131.     Plaintiff Cecelia Hanley is a citizen of the United States and domiciled in the State of Georgia. She is the sister of Patrick Hanley.

132.     As a result of the attack and the injuries he suffered, Plaintiff Patrick Hanley has experienced severe physical and mental anguish and extreme emotional pain and suffering.

133.     As a result of the attack and the injuries suffered by Patrick Hanley, Plaintiffs Katherine Hanley, Edward Hanley, and Cecelia Hanley have experienced severe mental anguish and extreme emotional pain and suffering.

**ATTACK 7: APRIL 28, 2008 – BAGHDAD, IRAQ**

**g.  The Montalbano Family**

134.     Samuel Montalbano served in Iraq in the U.S. Army in the 1st Battalion, 2nd Stryker Cavalry Regiment.

135.     On April 28, 2008, during the Battle of Sadr City, Samuel Montalbano was forced to jump from a rooftop carrying hundreds of pounds of gear to escape direct fire from Jaysh al-Mahdi terrorists. Iran and/or its agents and proxies provided the funding, weapons, training, and/or other material support used to commit the attack that injured Samuel Montalbano, as well as

planned, committed, and/or authorized the attack. He was 18 years old at the time of the attack.

136.    As a result of the attack, Samuel Montalbano suffered from a herniated disk, PTSD, and hearing loss. He now has an 80% disability rating from the U.S. Department of Veterans Affairs.

137.    At the time of the attack, Samuel Montalbano was a citizen of the United States and is currently domiciled in the State of Alabama.

138.    Plaintiff Deborah Wilson is a citizen of the United States and domiciled in the State of Alabama. She is the mother of Samuel Montalbano.

139.    As a result of the April 28, 2008, attack and resulting injuries, Plaintiff Samuel Montalbano has experienced severe physical and mental anguish and extreme emotional pain and suffering.

140.    As a result of the attack and Samuel Montalbano's injuries, Deborah Wilson has experienced severe mental anguish and extreme emotional pain and suffering.

**ATTACK 8: JUNE 24, 2008 – BAGHDAD, IRAQ**

### h.  The Farley Family

141.    Steven L. Farley worked in Iraq under the auspices of the U.S. Department of State, as a member of a Provincial Reconstruction Team ("PRT") in eastern Baghdad in 2008.

142.    On June 24, 2008, a Jaysh al-Mahdi cell—whose members had received training from Hezbollah in Iran—executed a sophisticated assassination bombing in a local government office in Sadr City that targeted Americans and local government officials who were not following Sadr. The bomb killed eleven people, including Steven L. Farley and three other Americans.

143.    The attack that killed Steven L. Farley was Iranian-funded and carried out by Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

144.    Steven L. Farley was a U.S. citizen when he was killed in Iraq.

145.    Plaintiff Jessica Farley is a citizen of the United States and domiciled in the State of Oklahoma. She is the daughter-in-law of Steven L. Farley; had an especially close relationship with her father-in-law; and thought of him as the equivalent of a biological father.

146.    As a result of the attack and Steven L. Farley's death, Plaintiff Jessica Farley has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven L. Farley's society, companionship, comfort, advice, and counsel.

**ATTACK 9: APRIL 13, 2009 – BAGHDAD, IRAQ**

  **i.   The Moncada Family**

147.    Raul Moncada served in Iraq in the U.S. Army in the 563rd Military Police Company, 91st Military Police Battalion, 10th Sustainment Brigade, 10th Mountain Division.

148.    On April 13, 2009, Raul Moncada was killed by an EFP planted and detonated by Jaysh al-Mahdi near Baghdad, Iraq. The terrorist group that planned and executed the attack, Jaysh al-Mahdi, was trained and armed by Hezbollah at the behest of Iran's IRGC. Raul Moncada was 29 years old when he was killed.

149.    The weapon used to kill Raul Moncada was an Iranian-manufactured EFP provided to Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

150.    Raul Moncada was a U.S. citizen when he was killed in Iraq.

151.    Plaintiff Obdulia Moncada is a Permanent Resident of the United States and domiciled in the State of California. She is the mother of Raul Moncada, and depended upon him in part for economic, physical, and emotional support.

152.    Plaintiff P.M., by and through her next friend Monica Moncada, is a citizen of the United States and domiciled in the State of New York. She is the minor daughter of Raul Moncada.

153.    Plaintiff Miriam Lopez is a citizen of the United States and domiciled in the State of California. She is the sister of Raul Moncada.

154.    Plaintiff Alexandra Aguilar is a citizen of the United States and domiciled in the State of Maryland. She is the sister of Raul Moncada.

155.    Plaintiff Daniela Moncada is a citizen of the United States and domiciled in the State of California. She is the sister of Raul Moncada.

156.    Plaintiff Matthew Moncada is a citizen of the United States and domiciled in the State of California. He is the brother of Raul Moncada.

157.    As a result of the attack and Raul Moncada's death, Obdulia Moncada, P.M., a minor, Miriam Lopez, Alexandra Aguilar, Daniela Moncada, and Matthew Moncada have experienced severe mental anguish, extreme emotional pain and suffering, and the loss of Raul Moncada's society, companionship, comfort, advice, and counsel.

**ATTACK 10: OCTOBER 12, 2009 – AL AMARA, IRAQ**

### j.   Stephen Evens

158.    Stephen W. Evans served in Iraq in the U.S. Army with E Company, 4/6 Brigade Combat Team, 1st Armored Division.

159.    On October 12, 2009, Stephen W. Evans was injured by an array of EFPs planted and detonated by Jaysh al-Mahdi outside of Al Amara on Route Topeka.

160.    Stephen W. Evans was struck by shrapnel and copper from the EFPs, suffering a number of soft and hard tissue damage. The explosion removed part of his left leg and left thigh, burned his face, peppered the left side of his body with shrapnel, broke his jaw and other bones in his face, caused other significant physical injuries and traumatic brain injury, and left him in a coma for days afterwards. Mr. Evans spent two and a half years receiving numerous surgeries and

medical care at Brook Army Medical Center in San Antonio, TX until he was medically retired.

161.     The attack that injured Stephen W. Evans was Iranian-funded and carried out by Iranian-funded and -trained Jaysh al-Mahdi terror operatives in Iraq.

162.     Stephen W. Evans is a U.S. citizen and was a U.S. citizen when he was injured in Iraq, and is currently domiciled in the State of California.

163.     As a result of the attack and his injuries, Plaintiff Stephen W. Evans has experienced severe physical and mental anguish and extreme emotional pain and suffering.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**AGAINST DEFENDANT ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM FOR DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE, AND/OR HOSTAGE TAKING THAT RESULTED IN PERSONAL INJURY UNDER 28 U.S.C. § 1605A(c)**

164.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

165.     Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendant's provision of material support (within the meaning of § 1605A(h)(3)) to terror operatives in Iraq who engaged in extrajudicial killing and who injured Plaintiffs.

166.     As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses.

167.     Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses determined by the trier of fact.

168.    The conduct of Defendant was criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

<u>SECOND CLAIM FOR RELIEF</u><br>
<b>AGAINST DEFENDANT ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE, AND/OR HOSTAGE TAKING THAT RESULTED IN WRONGFUL DEATH UNDER 28 U.S.C. § 1605A(c)</b>

169.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

170.    The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendant's provision of material support (within the meaning of § 1605A(h)(3)) to terror operatives in Iraq who engaged in the acts of extrajudicial killing that caused the decedents' deaths.

171.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant and its agents, the decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately led to their deaths.

172.    Defendant is therefore liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering, and any pecuniary loss (or loss of income to the estates).

173.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

**THIRD CLAIM FOR RELIEF**

**AGAINST DEFENDANT ON BEHALF OF THE FAMILIES OF VICTIMS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE, AND/OR HOSTAGE TAKING FOR LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(c)**

174.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

175.    Defendant's acts in providing material support for acts of extrajudicial killing, torture, and/or hostage-taking were intended to inflict severe emotional distress on Plaintiffs.

176.    As a direct and proximate result of the willful, wrongful, and intentional acts of Defendant's acts, the families of individuals identified in the foregoing paragraphs who were injured or killed as a result of Defendant's acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking have suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

177.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

**FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANT ON BEHALF OF OBDULIA MONCADA, THE U.S. PERMANENT RESIDENT FAMILY MEMBER OF RAUL MONCADA WHO WAS KILLED AS A RESULT OF DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING FOR INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER CALIFORNIA STATE TORT LAW**

178.    Plaintiff Obdulia Moncada repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

179.    Defendant's acts in providing material support for acts of extrajudicial killing were

extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, severe emotional distress on Plaintiff Obdulia Moncada. Such conduct was directed at Obdulia Moncada as a family member of the intended victim of terroristic violence, Raul Moncada.

180.   Defendant's wrongful acts were the actual and proximate cause of Raul Moncada's death and the severe emotional distress experienced by Obdulia Moncada.

181.   As a result of Defendant's acts, Obdulia Moncada suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

182.   Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to California State tort law.

183.   Plaintiff Obdulia Moncada reasonably estimates that Defendant's conduct has resulted in damages in excess of $75,000.

### FIFTH CLAIM FOR RELIEF
**AGAINST DEFENDANT ON BEHALF OF OBDULIA MONCADA, THE U.S. PERMANENT RESIDENT FAMILY MEMBER OF RAUL MONCADA, WHO WAS KILLED AS A RESULT OF DEFENDANT'S MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING FOR WRONGFUL DEATH UNDER CAL. CODE CIV. PROC. §§ 377.60–377.62**

184.   Plaintiff Obdulia Moncada repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

185.   Defendant's acts in providing material support for acts of extrajudicial killing were extreme and outrageous conduct resulting in the death of Raul Moncada.

186.   Defendant's wrongful acts were the actual and proximate cause of the death of Raul Moncada.

187.    Plaintiff Obdulia Moncada was the mother of Raul Moncada and dependent upon him in part for economic, physical, and emotional support.

188.    As a result of Defendant's acts, Plaintiff Obdulia Moncada suffered the loss of Raul Moncada's economic, physical, and emotional support. She also suffered severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

189.    Defendant's conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of damages against Defendant as justice so requires under Cal. Code Civ. Proc. §§ 377.60–377.62.

190.    Plaintiff Obdulia Moncada reasonably estimates that Defendant's conduct has resulted in damages in excess of $75,000.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand:

(a) Judgment for all Plaintiffs against Defendant for compensatory damages, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and loss of solatium, in amounts to be determined at trial;

(b) Judgment for Plaintiff Estates against Defendant for compensatory damages for wrongful death, including, but not limited to, physical injury, extreme mental anguish, pain and suffering, economic losses, and any pecuniary loss (or loss of income to the estates) in amounts to be determined at trial;

(c) Judgment for all Plaintiffs against Defendant for punitive damages in an amount to be determined at trial;

(d) Plaintiffs' costs and expenses;

(e) Plaintiffs' attorney's fees; and

(f) Such other and further relief as the Court finds just and equitable.

Dated: October 23, 2019

Respectfully submitted,

/s/ Michael J. Gottlieb
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC 20006
Phone: (202) 303-1442
Fax: (202) 303-2126
mgottlieb@willkie.com