**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **NEIBERGER,** *et al.*, |
| **Plaintiffs,** |
| **v.** |
| **ISLAMIC REPUBLIC OF IRAN,** |
| **Defendant.** |

**No. 16-cv-2193-EGS-ZMF**

## REPORT AND RECOMMENDATION

From 2006 to 2009, a series of terrorist attacks in Iraq killed or severely injured U.S. military servicemembers and civilians.  The following ten U.S. military servicemembers and civilians were victims in the attacks: Patrick Hanley, Samuel Montalbano, and Stephen Evans— who were injured in the attacks and are themselves plaintiffs in this case along with family members; Christopher Neiberger and Joshua Reeves—who died in the attacks and whose estates and family members are represented here; and Rod Richardson, Blake Stephens, Steven Davis, Steven Farley, and Raul Moncada—who died in the attacks and whose family members are plaintiffs.  These attack victims, their estates, and their family members (collectively "Plaintiffs") bring this action seeking compensation for their economic and psychological injuries from the foreign sovereign defendant, the Islamic Republic of Iran, under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA").  *See* 28 U.S.C. § 1605A.  Central to this case is the Plaintiffs' argument that each of the ten attacks was a consequence of Iran's proxy war against the United States in Iraq.

After Defendant failed to appear, the Clerk of Court entered default.  *See* Clerk's Entry of Default, ECF Nos. 21, 66.  Plaintiffs then moved for default judgment as to liability and damages.

*See* Mot. for Default J., ECF No. 77.   Judge Sullivan subsequently referred this case to the undersigned for full case management including the preparation of this report and recommendation.   *See* Min. Order (Oct. 5, 2021).   For the reasons stated below, the Court recommends GRANTING Plaintiffs' Motion for Default Judgment as to liability and GRANTING IN PART and DENYING IN PART Plaintiffs' Motion as to damages in accordance with the findings herein.

## I.   LEGAL STANDARD

District courts may in their discretion enter a default judgment upon a party's motion when the opposing party fails to appear.  *See* Fed. R. Civ. P. 55(b)(2); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 124 (D.D.C. 2019).   To obtain a default judgment, plaintiffs must establish their claims "by evidence satisfactory to the court."   28 U.S.C. § 1608(e).   Thus, "when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).   A court "may not unquestioningly accept a complaint's unsupported allegations as true."   *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 64–65 (D.D.C. 2015).   A court however lacks the authority "to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant."  *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019).

"An evidentiary hearing is not required; a plaintiff may establish proof by affidavit," *Moradi*, 77 F. Supp. 3d at 65, "declarations," *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021), or "other written materials as [plaintiffs] can otherwise obtain," *Mwani v. bin Laden*, 417 F. 3d 1, 7 (D.C. Cir. 2005).   "Indeed, cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA . . .

based solely upon expert testimony." *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017), *vacated and remanded sub nom. on other grounds Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Furthermore, "[a] court may take judicial notice of related proceedings and records in cases before the same court." *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005)).

To enter a default judgment, "the Court must—at a minimum—satisfy itself that it has subject matter jurisdiction over the claims and personal jurisdiction over the defendants." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 56 (D.D.C. 2018) (citing *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014)). Generally, the FSIA grants "subject matter and personal jurisdiction . . . over any claim against a foreign state as to which the state is not entitled to immunity." *Hegna v. Islamic Revolutionary Guard Corps*, 908 F. Supp. 2d 116, 118–19 (D.D.C. 2012) (quoting *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1159 n.5 (D.C. Cir. 2002)).

## II. ANALYSIS

### A. Subject Matter Jurisdiction and Liability for § 1605A(c) Claims

This action is brought under 28 U.S.C. § 1605A, the so-called "terrorism exception." *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 352 (D.C. Cir. 2018). The terrorism exception to the FSIA relinquishes a foreign state's immunity and affords federal courts with subject matter jurisdiction over suits when

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act [(5)] if such act or provision of material support or resources is engaged in

3

> by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  In addition, the foreign state must have been designated as a state sponsor of terrorism at the time of the attack and the claimant or victim must have been a "national of the United States," "member of the armed forces," or federal employee at the time of the attack.[1] *Id.* § 1605A(a)(2)(A)(ii).  "The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear." *Fritz*, 320 F. Supp. 3d at 76.

Most of these conditions are easily met.  First, Plaintiffs seek money damages and attorney's fees.  *See* Compl. § VII.  Second, their claims seek recovery "for personal injury" or "death."  Mot. for Default J. at 61–73.  Third, the United States has designated Iran as a state sponsor of terrorism since 1984.  *See* U.S. Dep't of State, State Sponsors of Terrorism, available at https://www.state.gov/state-sponsors-of-terrorism/.  Fourth, at the time each attack occurred, the victims were U.S. nationals and members of the U.S. armed forces or of the U.S. government.

Thus, the only substantial jurisdictional questions regard whether the injuries and deaths were "caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act" by an "official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).  The Court analyzes these issues in their component parts, starting with whether these attacks resulted in extrajudicial killings.

1.   *Extrajudicial Killing*

An "extrajudicial killing" is defined by cross-reference to Section 3 of the Torture Victim Protection Act ("TVPA") as "a deliberate killing not authorized by a previous judgment

---

[1] Because these attacks did not "occur[] in the foreign state against which the claim has been brought," but rather took place in Iraq, the final requirement that "the claimant []afford[] the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," does not apply here.  28 U.S.C. § 1605A(a)(2)(A)(iii).

pronounced by a regularly constituted court." *Id.* § 1605A(h)(7) (citing Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992)).  As detailed below, Dr. Gartenstein-Ross[2] offers evidence that each attack was carried out by a violent non-state actor, such as a terrorist organization.  Thus, none of these attacks were authorized by a previous judgment from a regularly constituted court.  *See Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020).

"A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."  *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 363 (D.D.C. 2020) (quoting *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) (citations omitted)).  The sophistication of the attack and the prior planning required to carry it out—i.e., "with intelligence gathering, by selecting the site; with logistics, by purchasing the [weapon]; [or] operationally by training to commit the attack"—are indicative of deliberation.  *Schwartz*, 2020 WL 7042842, at *12.

In interpreting the FSIA, "courts resolve statutory 'ambiguities flexibly and capaciously' in light of the text, history, and remedial purpose of the statute to compensate those injured in terrorist attacks."  *Force*, 464 F. Supp. 3d at 360 (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d

---

[2] Many of the Court's findings are derived from the testimony and expert report of Dr. Gartenstein-Ross.  Courts in this District have previously certified Dr. Gartenstein-Ross as: 1) an expert in the areas of terrorism and jihadist groups, *see Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 133 (D.D.C. 2021); *Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *9 n.7 (D.D.C. Sept. 10, 2020); 2) an expert on "violent nonstate actors generally, ISIS's evolution from its predecessor organizations, and ISIS's material supporters," *Sotloff*, 525 F. Supp. 3d at 133; 3) "an expert on [Qais al-Khazali's Asa'ib Ahl al-Haq ("AAH")] and Iranian support for terrorism in Iraq," *see Fritz*, 320 F. Supp. 3d at 58 n.2; and 4) "an expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 193 n.4 (D.D.C. 2017).  Considering the requirements of Federal Rule of Evidence 702, the Court has found Dr. Gartenstein-Ross qualified to offer the opinions relied upon herein as an expert on Iranian support for violent non-state actors and terrorism in Iraq.  *See* Mot. for Default J. at 6 n.2 (listing qualifications).

1165, 1167 & n.4 (D.C. Cir. 2013)).  Consequently, the consensus among courts is that "material support for an attack that extrajudicially killed someone other than the injured servicemember represented in this case is sufficient for jurisdictional purposes." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *see, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214, 2019 WL 3037868, at *1 (D.D.C. July 11, 2019).

a.      Explosively Formed Penetrator ("EFP") Attacks

An EFP is a lethal improvised explosive device ("IED") that consists of a pipe or tube packed with explosives, a detonator, and a concave copper disk.  *See* Mot. for Default J. at 64–65. "Detonation of the EFP forces the inverted center of the disk outwards into a molten slug capable of traveling 2,000 meters per second or more," which "is sufficient to puncture an 'up-armored' Humvee's rolled homogenous armor." *Karcher*, 396 F. Supp. 3d at 26.  EFPs account for more than twenty percent of all U.S. combat deaths in the Iraqi theater.  *See* Expert Report of Dr. Gartenstein-Ross, at 47, ECF No. 73-6 [hereinafter Gartenstein Report].

"[T]he thought and consideration required to conduct an EFP attack are hallmarks of deliberation." *Roberts v. Islamic Republic of Iran*, No. 20-cv-1227, 2022 WL 203540, at *13 (D.D.C. Jan. 24, 2022).  The level of sophistication and expertise required to detonate EFPs "[i]s beyond the capacity of individuals with basic training in IED construction." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 484 (D.D.C. 2021).Indeed, the perpetrator of an EFP must conceal the explosive device (often within a boulder, roadside curb, or debris), maintain remote surveillance of the target, and detonate the explosive device at the moment the target approaches. *See id.* at 484–85.  "Planning an EFP's location and constructing a means to trigger the device

require forethought, and an EFP therefore cannot be detonated on 'a sudden impulse.'" *Lee*, 518 F. Supp. 3d at 492 (quoting *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475, 2019 WL 4673761, at *13 (D.D.C. Sept. 25, 2019)).  This Court finds—and takes notice of previous findings—that deploying an EFP is a "deliberated" attempt to kill someone, even when no fatalities result.  *See, e.g.*, *id.* ("[C]ausing or attempting to cause death by detonating an EFP constitutes a deliberated killing."); *Karcher*, 396 F. Supp. 3d at 56 ("By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate.").  Thus, each of the claims arising out of the seven EFP attacks meets the "deliberated killing" element.  *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 58.

> b.      Non-EFP Attacks

On June 24, 2008, an improvised IED planted at the District Advisory Council ("DAC") building in Sadr City killed U.S. State Department official Mr. Farley among several others.  *See* Mot. for Default J. at 42.  At the time of the explosion, Mr. Farley was meeting with the DAC, a group of local Iraqi religious and government leaders.  *See id.*  The IED "was pre-positioned in the room, set low on the ground or under a couch," and likely "concealed inside a package which would not look out of place inside the room."  *Id.* at 72 (quoting Farley CENTCOM (Ex. 153)[3] at 11, 30, ECF No. 76-22).  "The explosion happened just outside the room, near the Americans," who were standing by the door.  Alissa J. Rubin and Mudhafer Al-Husaini, *Baghdad Blast Kills Four Americans*, The New York Times (June 25, 2008) https://www.nytimes.com/2008/06/25/world/middleeast/25iraq.html.  This was a prototypical deliberated, extrajudicial killing.  *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d

---

[3] The exhibit number is in reference to the Plaintiffs' Motion for Default Judgment.

117, 124 (D.D.C. 2007) (concluding that a death "was caused by a willful and deliberate extrajudicial killing because it was caused by a detonation of explosive material planted by Muhammad Uda . . . and intentionally detonated by him on or around 1:00 p.m. on that date").

On July 4, 2007, a hand grenade killed U.S. Army Specialist ("SPC") Davis while he was conducting a patrol to escort civilian contractors. *See* Mot. for Default J. at 50–51. SPC Davis was travelling in a five-vehicle convoy at the time. *Id.* A declassified military analysis concluded that "[i]nsurgents waited to throw grenade at last vehicle then used car [sic] to get away." Davis AR 15-6 (Ex. 169) at 19, ECF No. 76-23. "[T]he antitank grenade penetrated above the driver's door, and continued to penetrate the gunner's turret," where SPC Davis was located. *Id.* at 4. SPC Davis died from fatal shrapnel wounds to the head. *See* Mot. for Default J. at 51–53. That the perpetrators waited until the convoy had passed and targeted the driver's door of the last car evinces the type of intentional planning of a deliberated, extrajudicial killing. *See Schwartz*, 2020 WL 7042842, at *12.

The final attack at issue involves an episode of rocket fire that occurred during the Battle of Sadr City. *See* David E. Johnson, M. Wade Markel & Brian Shannon, The 2008 Battle of Sadr City (Santa Monica, CA: RAND Corporation, 2011), https://www.rand.org/content/dam/rand/pubs/occasional_papers/2011/RAND_OP335.pdf. On April 28, 2008, while clearing a block in Sadr City, Corporal ("CPL") Samuel Montalbano "became aware that someone in the unit's vicinity was taking direct fire." Montalbano Decl. (Ex. 55) ¶ 11, ECF 76-4. CPL Montalbano jumped to avoid enemy rocket fire and suffered a debilitating back injury. *See* Mot. for Default J. at 46. A report by the Department of Defense later concluded that the building was attacked with five Improvised Rocket Assisted Mortars ("IRAMs"), which have a range of 100 to 400 meters. *See id.* at 48. Holes from rocket fire were

later found in the building from which CPL Montalbano jumped. *See id.* at 49. The latrines and a wall on the northern side were "completely destroyed." *Id.*

Although CPL Montalbano was not killed, this attack still qualifies as an intentional planning of a deliberated, extrajudicial killing. *See Force*, 464 F. Supp. 3d at 361. In *Force*, three plaintiffs respectively survived a stabbing attack, a shooting, and a rocket attack. *See id*. The court reasoned that "[c]ompensating the victims of such brutal attacks, which were designed to cause the victims' deaths, to inflict suffering, and to inspire terror, directly furthers the purpose of the terrorism exception to the FSIA." *Id.* Other courts have reached the same conclusion as to shootings and rocket fire. *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017). Likewise, the terrorist group here was in the midst of a month-long battle with U.S. forces in Sadr City and knew U.S. servicemembers would be stationed therein. *See* Erica Goode and Michael R. Gordon, *U.S. and Iraqis Battle Militias to End Attacks*, The New York Times (Apr. 7, 2008), available at https://www.nytimes.com/2008/04/07/world/middleeast/07iraq.html. Targeting U.S. troops with rocket fire, which "completely destroyed" parts of the building from which CPL Montalbano jumped, is the type of planned, intentional attack that constitutes an extrajudicial killing. *See Force*, 464 F. Supp. 3d at 364 (finding rocket attack that was "part of coordinated rocket campaign during a particularly active period of conflict" to be deliberate).

2.   *Provision of Material Support or Resources*

The FSIA adopts the definition of "material support or resources" found in 18 U.S.C. § 2339A. *See* 28 U.S.C. § 1605A(h)(3). As applied here, material support or resources consist of:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or

> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials . . . .

*Karcher*, 396 F. Supp. 3d at 54 (quoting 18 U.S.C. § 2339A(b)(1)).  "In order to complete the link to Iran, the material support or resources must have been provided 'by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.'"  *Id.* at 55 (quoting 28 U.S.C. § 1605A(a)(1)).

### a.    Background

Dr. Gartenstein-Ross detailed Iran's use of violent non-state actors as proxy forces of the Islamic Revolutionary Guard Corps ("IRGC")—an Iranian military entity and designated terrorist organization[4]—and Iran's funneling of financing, weapons, training, safe haven, and assistance to Shia militia groups in Iraq, including Jaysh al-Mahdi ("JAM"), AAH, and other groups.  *See* Gartenstein Report at 42–60.  Iran's motives for doing so included "dissuading the U.S. from invading Iran, weakening U.S. forces in Iraq, and allowing Iran to heavily influence Iraqi politics." *Id.* at 42.

Iran's cross-border operations were carried out by the IRGC and the Quds Force (or "IRGC-QF"), an elite division "responsible for the IRGC's extraterritorial covert and military operations."  *Id.* at 18–19.

> Beginning in the early 1980s, IRGC shaped the development and
> military capabilities of Lebanese Hezbollah, a militant Shi'a
> political party that wanted to oust Israeli forces from Southern
> Lebanon. As the relationship between IRGC and Hezbollah grew,
> Hezbollah reciprocated by executing terrorist missions against
> Israeli and American targets at Iran's request, offering Iran
> reasonable deniability after the fact.

---

[4] On April 15, 2019, the U.S. Secretary of State designated the IRGC as a Foreign Terrorist Organization.  *See* U.S. Dep't of State, Foreign Terrorist Organizations, available at https://www.state.gov/foreign-terrorist-organizations/.

*Karcher*, 396 F. Supp. 3d at 23 (citations and quotation marks omitted).  Together, IRGC and

Hezbollah provided material support and resources to terrorist groups to carry out Iran's military

campaigns.  *See* Gartenstein Report at 20.  Courts have recognized Iran's support for terrorist

groups in Iraq through the IRGC, Quds Force, and Hezbollah:

> The IRGC is a military institution that operates separately from the
> ordinary Iranian military; instead of defending Iran's borders, the
> IRGC is charged with preserving the ideals of the Islamic Republic,
> both in Iran and elsewhere. . . . Iran, through the Quds Force, sought
> to turn Shia militia extremists into a Hezbollah-like force to serve
> its interests and fight a proxy war against the Iraqi state and coalition
> forces in Iraq. This effort to use proxies in Iraq was part of a
> deliberate policy to inflict casualties on U.S. forces that was
> approved by the Supreme Leader of Iran and was executed very
> covertly by the Quds Force.

*Fritz*, 320 F. Supp. 3d at 58–59, 62 (quotation marks and citations omitted).

> b.      Support for JAM and Special Groups[5]

JAM is a terrorist group that formed in the aftermath of the U.S. invasion of Iraq in 2003.

*See* Gartenstein Report at 30; *Fritz*, 320 F. Supp. 3d at 61–62.  According to Dr. Gartenstein-Ross,

JAM was responsible for all attacks in this case, except for the July 4, 2007 attack that killed SPC

Steven Davis.  *See* Gartenstein Report at 4–5.

"Iran offered [JAM] financing and weapons training, and the Qods Force dispatched

Hezbollah operatives to help establish JAM and provide it with logistical assistance."  *Lee*, 518 F.

Supp 3d at 483 (quotation marks omitted).  Out of JAM formed several "JAM Special Groups,"

which also received Iranian backing.  Gartenstein Report at 33–34.  One such JAM Special Group

was AAH, which continued to receive substantial Iranian support and resources.  *See id.* at 31–32;

---

[5] The term "Specials Groups" refers to "a somewhat amorphous conglomeration of Iranian-backed
Shia militias" that splintered from JAM.  *Fritz*, 320 F. Supp. 3d at 62.  Like JAM, the Special
Groups received funding, training, and weapons from Hezbollah and the Quds Force.  *See Karcher*,
396 F. Supp. 3d at 24.

*see also Karcher*, 396 F. Supp. 3d at 25 (AAH "was able to maintain a fairly high-level offensive tempo and operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF"). "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise 'would [have been] unable to conduct their terrorist attacks in Iraq.'" *Fritz*, 320 F. Supp. 3d at 62 (quoting General David Petraeus, then-Commander, Multinational Force–Iraq).

In consideration of these past findings in *Karcher* and *Fritz* and the exhaustive report by Dr. Gartenstein-Ross, this Court too finds that Iran was providing material support and resources to terrorist groups through the Quds Forces and Hezbollah at the time of the attacks at issue. *See, e.g.*, *Lee*, 518 F. Supp. 3d at 480 (taking judicial notice of *Karcher* and *Fritz* pursuant to Federal Rule of Evidence 201(b)); *see* Gartenstein Report at 42–60. First, Iran's provision of weapons to "Shia militias constituted perhaps Iran's most lethal and most visible form of support." Gartenstein Report at 45–46. Courts have previously made these findings. *See, e.g.*, *Fritz*, 320 F. Supp. 3d at 63 (quotation marks omitted) (finding the Quds Forces provided Iraqi militants with Iranian-produced advanced weapons, including rockets, sniper rifles, automatic weapons, mortars, and EFPs); *Karcher*, 396 F. Supp. 3d at 25 (finding Iran supplied or bankrolled many types of weapons used by Shi'a militia groups in Iraq). Second, Iran or its agents also provided support by "operat[ing] a robust training program for Iraqi Shia militias inside Iran's borders."[6] Gartenstein

---

[6] In 2007, the State Department concluded that "[t]he Qods Force, in concert with Lebanese Hizballah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a 'train-the-trainer' program. In addition, the Qods Force and Hizballah have also provided training inside Iraq." Gartenstein Report at 50 (quoting U.S. Department of State, *Country Reports on Terrorism* (2007), https://2009-2017.state.gov/j/ct/rls/crt/2007/103711.htm).

Report at 49; *see also Fritz*, 320 F. Supp. 3d at 63–64.  Third, Iran or its agents offered safe haven to Shia militia members, issuing special passports to Special Group leaders and junior members. *See* Gartenstein Report at 54.  This not only safeguarded terrorists but also facilitated the coordination between Iran and militia groups.  *Id.* at 56–58.

Finally, Iran supported JAM terrorists and Special Groups through funding.  *See id.* at 54–57; *Karcher*, 396 F. Supp. 3d at 24; *Fritz*, 320 F. Supp. 3d at 63; *Lee*, 2021 WL 325958, at *4.  As of 2007, "the Quds Force also supplie[d] the Special Groups with weapons and funding of $750,000 to $3 million U.S. dollars a month."  Gartenstein Report at 50 (quoting Gen. Kevin Bergner, press conference, July 2, 2007).  "This funding comprised a significant portion of Iran's broader funding to myriad violent non-state actors across the Middle East, which likely exceeded $300 million annually from 2006–2009."  *Id.* at 54.  Courts have concluded that Iran also provided funding to Hezbollah, which furthered Iran's efforts to destabilize the region by supporting Shia terrorists in Iraq.  *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 88 (D.D.C. 2010) (finding that in 2008 alone, "Iran provided approximately $200 million in direct cash assistance to Hezbollah"); *Fritz*, 320 F. Supp. 3d at 60 ("Iran played a central role in Hezbollah's development and growth" based on funding.).

c.      Support for al-Qaeda in Iraq ("AQI")

Though a predominately Shi'a country, Iran also provided material support and resources to Sunni militant groups, including the Zarqawi organization, or AQI.[7]  *See* Gartenstein Report at § XVI.

---

[7] The Zarqawi organization is a Sunni militant group that has undergone several name changes since its emergence in the early 1990s.  It was known as AQI during the years in question and is currently known as the Islamic State (or ISIS).  *See* Gartenstein Report at 74.  Dr. Gartenstein-Ross refers to this terrorist organization as both "Zarqawi" and "AQI" throughout his report.

Plaintiffs' expert concluded that "Iran had contact with the Zarqawi organization, and was willing to provide financial support, logistical assistance, weaponry, and safe haven to the Zarqawi organization for its campaign of violence between 2003 and 2010." *Id.* at 84.  Iran provided safe haven to Zarqawi and its leaders by "permit[ting] Zarqawi recruits to transit Iranian territory and make use of safe houses in different parts of the country." *Id.* at 85; *see* Mot. for Default J. at 98–103.  Evidence further suggests that Iran coordinated to provide funding and weapons to Zarqawi/AQI. *See* Gartenstein Report at 86–87.  In December 2006, IRCG-QF leaders were found with "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information," suggesting that "Iran [was] working with individuals affiliated with [AQI] and Ansar al-Sunna." *Id.* at 86.  In 2008, a Sunni terrorist reported in an interview that Iran was providing AQI with "money and weapons, and facilitating the movement of its fighters across the Middle East and South Asia.  The apparent intent of this support was to 'deter the United States, in order for [the U.S.] not to give its entire attention to Iran.'" *Id.* at 87 (quoting "Kuwaiti Cleric Admits Sending Mujahedin to Iraq, Afghanistan, Argues Iran Involved," Al-Qabas, May 7, 2008).

Evidence of a foreign sovereign's material support of a terrorist organization may include the "motive to foment unrest in a particular area where the group is operating." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2021 WL 6843587, at *8 (D.D.C. June 23, 2021) (citing *W.A.*, 427 F. Supp. 3d at 136).  According to Dr. Gartenstein-Ross, Iran's support of AQI was "essentially a product of pragmatic expediency."  Gartenstein Report at 87.  In short, their interests aligned. *See id.*  Courts have recognized a similar alliance between Iran and al-Qaeda:

> Both Iran and al Qaeda can be ruthlessly pragmatic, cutting deals
> with potential future adversaries to advance their causes in the short-

> term. Members of the Shiite and Sunni sects—particularly at the leadership level—often work together on terrorist operations. The religious differences, to the extent they retain any vitality at the leadership level, are trumped by the leaders' desire to confront and oppose common enemies, particularly the U.S. . . . .

*In re Terrorist Attacks on September 11, 2001*, No. 03-mdl-1570, 2011 WL 13244047, at *12 (S.D.N.Y. Dec. 22, 2011) (citations omitted); *see also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 105–08 (D.D.C. 2015) (concluding that Iran provided financial support, training, and safe passage to al-Qaeda); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1100 (D.C. Cir. 2019) (explaining that Iran was linked to bombings executed by al Qaeda).

The above findings demonstrate that Iran provided material support and resources to AQI. *See* Gartenstein Report at 94–95; *cf. Flanagan*, 87 F. Supp. 3d at 105–08 (concluding that Iran materially supported AQI's former affiliate, al-Qaeda, through financial support, training, and safe passage).

> d.    Scope of Office

Finally, Iran provided its material support at the direction of Iranian officials or agents acting within the scope of their "office, employment, or agency." 28 U.S.C. § 1605A(a)(1); *see, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60–61 (D.D.C. 2006) (finding, for purposes of punitive damages, that IRGC was a governmental entity, rather than commercial agent). As determined in the above finding of facts, the IRGC and Quds Force were responsible for cultivating proxies in other countries and did so with both the Lebanese Hezbollah and AAH. "The Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran. Those findings are sufficient to satisfy the scope of office requirement." *Fritz*, 320 F. Supp. 3d at 85; *see also Karcher*, 396 F. Supp. 3d at 55 (concluding the same).

3.      *Causation*

The final requirement for the Plaintiffs is to establish that Iran's conduct was the proximate cause of their personal injuries or deaths.  *See Fritz*, 320 F. Supp. 3d at 85.  "[T]wo similar but distinct elements" are needed to establish proximate cause: (1) that "the defendant's actions [were] a 'substantial factor' in the sequence of events that led to the plaintiff's injury," and (2) that "the plaintiff's injury [was] 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794.  "In assessing reasonable foreseeability, moreover, the Court must consider 'the broader context' of Iran's conduct."  *Fritz*, 320 F. Supp. 3d at 86 (quoting *Owens*, 864 F.3d at 797).  "Even if [the defendant] did not intend that the victims sustain the specific injuries at issue, the events that led to those injuries were a 'reasonably foreseeable' consequence of [the defendant]'s actions." *Id.*  In the context of a defendant's provision of material support or resources, courts interpret causation broadly:

> Plaintiffs have not offered evidence that either Iran or Syria's support was tied to each of the attacks that caused their injuries. But such a "nexus" is not necessary because funds—and, in certain instances, arms and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on [terrorists groups'] "careful bookkeeping."

*Force*, 464 F. Supp. 3d at 368 (quoting *Kilburn*, 376 F.3d at 1130).  A state sponsor of terrorism "may not avoid liability [under FSIA ]for supporting known terrorist groups by professing ignorance of their specific plans for attacks." *Owens*, 864 F.3d at 799.

a.      EFP Attacks

Plaintiffs have established the requisite level of causation as to all seven EFP attacks. According to Dr. Gartenstein-Ross, "the best available evidence indicates that 1) Iranian-backed Shia militias were the only anti-American insurgents in Iraq to use sophisticated EFPs and 2) Shia militias required and obtained Iranian support to obtain or assemble these sophisticated EFPs."

Gartenstein Report at 46–49.  Courts have adopted these findings, of which this Court will take judicial notice.  *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 30 ("identification of the weapon as an EFP all but necessitates the inference that Iran was responsible."); *Lee*, 518 F. Supp. 3d at 483. ("[O]ne of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs."); *Pennington v. Islamic Republic of Iran*, No. 19-cv-796, 2021 WL 2592910 (D.D.C. June 24, 2021) (same).  The Court similarly finds that the use of EFPs is directly traceable to Iranian support.[8]

"EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly, indicating that EFPs were intentionally designed to inflict maximum harm on their targets."  *Lee*, 518 F. Supp. 3d at 492.It follows that Plaintiffs' fatal or severe injuries were a reasonably foreseeable (and *intended*) consequence of Iran's provision of EFPs and EFP training. *See id.* at 494 ("It is clear from Iran's financial support and its provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its support would lead to the death and serious injury of U.S. soldiers.").  "[T]he Court concludes that material support or resources to facilitate EFP attacks qualify as material support for attempted extrajudicial killings. Those attempts bring Iran within the terrorist exception to foreign sovereign immunity."  *Karcher*, 396 F. Supp. 3d at 58.

b.      Non-EFP Attacks by JAM Terrorists

A declassified U.S. government assessment found that JAM members met in Sadr City on June 23, 2008, to plan the next-day bombing of the DAC building that killed Mr. Farley.  *See* CENTRIXS Central (Ex. 157) at 1, ECF No. 76-22.  U.S. military intelligence further found that

---

[8] Thus, even when AQI was present at an EFP attack, such as the attack in Salman Pak that killed CPL Stephens, the use of an EFP indicates that Iran bears ultimate responsibility.  *See* Expert Report at 49, 64.

"it is possible that [Special Groups] observed our routines for a weekly meeting or may have learned that a U.S. State Department Official was supposed to visit the [DAC] on this day."  ECF No. 153 at 30.  Dr. Gartenstein-Ross likewise concluded that JAM was responsible for the attack, noting that Sadr City was a JAM and Special Groups stronghold at the time of the attack.  *See* Gartenstein Report at 70–72; Kimberly Kagan et al., Institute for the Study of War, *Iraq Situation Report* 19–20 (February 7, 2008), https://www.understandingwar.org/sites/default/files/reports/Iraq%20Situation%20Report.pdf.

During the April 28, 2008, rocket fire attack that targeted CPL Montalbano,[9] U.S. and JAM fighters were embroiled in a months-long battle.  CPL Montalbano recalled that "during that time in Sadr City, JAM forces made up the vast majority, if not all, of the combatant group that we engaged with."  Montalbano Decl. ¶ 8.  Dr. Gartenstein-Ross also concluded that JAM fighters were likely responsible for this attack, noting again that Sadr City "was heavily Shia and the center of JAM activities in Baghdad."  Gartenstein Report at 70.

---

[9] This attack is unique from the others in that neither deaths nor wounds were inflicted directly by the attack weapons; rather, the injury occurred when CPL Montalbano jumped to retreat from rocket fire.  Such incidental injuries are a reasonably foreseeable consequence of launching rocket fire into an occupied city and the type of "brutal attack[], which [was] designed to cause the victims' deaths, to inflict suffering, and to inspire terror."  *Force*, 464 F. Supp. 3d at 361.  This type of injury is not the type of "substantial expansion on the law as applied to date [that] threatens to open the door to a broad array of claims that Congress never contemplated."  *Id.*  Indeed, the terrorism exception was not "sufficiently capacious" to include a missile attack that struck a family's home and caused them related emotional distress, but that attack did not kill or wound anyone because none of the plaintiffs were home or even in the immediate vicinity when the missile struck.  *Id.* at 362–63.  Yet that geographic separation is inapplicable here, where the victim was present at the attack.  *See* Mot. for Default J. at 48.  Moreover, CPL Montalbano's injuries are directly traceable to the attack as opposed to general emotional distress related to property damage while in a war zone.  *See Force*, 464 F. Supp. 3d at 363.  As such, Iran's provision of material support and resources to the JAM forces in Sadr City was the proximate cause of CPL Montalbano's injuries.

As explained above, there is satisfactory evidence that Iran provided material support and resources in the form of weapons, training, safe haven, planning, and financing to JAM fighters. *See supra*.  The Court concludes that this Iranian support was a substantial factor in the bombing of the DAC building in Sadr City and the firing of rockets into Sadr City.  *See* Gartenstein Report at 69–71; *Fritz*, 320 F. Supp. 3d at 86–87 (finding Iran's provision of support and resources to AAH was "not only a substantial factor . . . [but also] a necessary ingredient" in the abduction and torture of a U.S. servicemember by the AAH).

Plaintiffs' injuries by JAM were a reasonably foreseeably consequence of Iran's conduct, especially considering the broader context of Iran's "comprehensive campaign to deter the U.S. from maintaining a presence in the Middle East by terrorizing and intimidating coalition forces." *Fritz*, 320 F. Supp. 3d at 86; *c.f. Owens*, 864 F.3d at 798 ("Sudan's claimed ignorance of al-Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them.").

Plaintiffs have thus established that, by providing material support and resources to the JAM forces, Iran caused the bombing of the DAC building that killed Mr. Farley and the rocket fire that resulting in CPL Montalbano's back injury.

c.     Non-EFP Attack by AQI

On July 4, 2007, terrorists launched a grenade attack that killed SPC Davis.  *See* Mot. for Default J. at 50–52.  The attack occurred at a time of United States' "increased counter-AQI operations in Baghdad."  Gartenstein Report at 98.  Dr. Gartenstein-Ross concluded that AQI was the most likely culprit because the attack occurred on the edge of Doura, a predominantly Sunni neighborhood and AQI stronghold at the time.  *See id.* at 89–94.  According to Dr. Gartenstein-Ross, this was the type of location for which Iran's support of AQI gave Iran the ability to attack

coalition forces "in [an] area[] largely inaccessible to Shia militias, and maintain a degree of plausible deniability." *Id.* at 87.   SPC Davis's platoon leader also attributed the attack to AQI based on his knowledge of the local support structure.   *See id.* at 90.

"Importantly, Plaintiffs need not demonstrate that [Iran] specifically intended to cause the [attack at issue]; they need only show proximate cause—that is, 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *11 (D.D.C. Sept. 10, 2020) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128-29 (D.C. Cir. 2004); Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)).   "[S]ufficient evidence of foreseeability include[s] backing the organization despite knowledge of their violent tactics and encouragement of an escalation of terrorist behavior."   *Doe*, 2020 WL 5422844, at *12 (citing *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015)).

Iran provided material support and resources in the form of weapons, safe haven, and financing to AQI.   *See supra*.   Thus, Iran's support for AQI was a substantial factor in the sequence of events that resulted in AQI's killing of SPC Davis.   *See Owens*, 864 F.3d at 797 (finding Sudan's past material support for al-Qaeda to be substantial factor in al-Qaeda's embassy bombings, despite multi-year separation between support and bombing and in spite of Sudan's subsequent acts in opposition to al-Qaeda).   SPC Davis's death was also a reasonably foreseeable consequence of Iran's conduct, particularly in view of the "broader context" of Iranian influence over Sunni militant groups in Iraq.   *Cf. Fritz*, 320 F. Supp. 3d at 86–87 (finding causation where Iran provided material support to terrorist organization and had knowledge of the organization's intent to carry out attacks on coalition forces).   Plaintiffs have thus established "some reasonable connection" between Iran's provision of material support and AQI's killing of SPC Davis.   *Kilburn*, 376 F.3d

at 1128–29.  Accordingly, Iran is not entitled to foreign sovereign immunity, and this Court possesses subject matter jurisdiction over Plaintiffs' claims pursuant to the terrorism exception.

      B.    <u>Personal Jurisdiction</u>

      Under the FSIA, a court has personal jurisdiction over a foreign state whenever the court has subject matter jurisdiction and service has been properly made.  *See* 28 U.S.C. §1330(b).

      Title 28 U.S.C. § 1608(a) sets out the four methods by which service may be made, in ranked order.  The first two methods could not be utilized here, given that (1) the parties lack a special service arrangement, and (2) the U.S. and Iran are not signatories to a service convention.  *See Pennington*, 2021 WL 2592910, at *3 (citing 28 U.S.C. § 1608(a)(1)–(2)).  Plaintiffs appropriately attempted foreign mailing to Iran pursuant to § 1608(a)(3).  *See* ECF No. 55.  However, the Clerk of Court subsequently concluded that service pursuant to § 1608(a)(3) was not possible.  *See* ECF No. 56.  Finally, Plaintiffs sought service through diplomatic channels pursuant to § 1608(a)(4).  *See* ECF Nos. 57–59.  On October 30, 2020, the State Department confirmed it transmitted Plaintiffs' documents to the Iranian Ministry of Foreign Affairs by way of the Embassy of Switzerland.  *See* ECF No. 63.  Plaintiffs have thus effected proper service of process on Iran pursuant to § 1608(a)(4), and this Court possesses personal jurisdiction over the Defendant.  *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012).

      C.    <u>Liability</u>

          1.    *Section 1605A(c)*

      Under the FSIA, state sponsors of terrorism "shall be liable . . . for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages."  28 U.S.C. § 1605A(c).  "There is almost total 'overlap

between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman*, 2019 WL 4673761, at *15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)) (cleaned up).  However, § 1605A(c) requires plaintiffs to individually demonstrate that they "are themselves U.S. nationals, members of the armed services, or government employees." *Force*, 464 F. Supp. 3d at 369.

"Although Section 1605A(c) provides a private right of action, it provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).  Consequently, a district court may "rely on well-established statements of common law[] found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353 (citing *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003)).  The Court analyzes each type of remedy below.

2.    *California IIED*

The only plaintiff who is not a member of an eligible group under § 1605A(c) is Ms. Obdulia Moncada—the mother of deceased Sergeant ("SGT") Raul Moncada.  *See* Mot. for Default J. at 108; 28 U.S.C. § 1605A(c).  Nonetheless, "plaintiffs ineligible to proceed under the federal cause of action may continue to press their claims under state law." *Owens*, 864 F.3d at 769.  Thus, Ms. Moncada properly brings her claim here under California state law, which recognizes a private right of action for intentional infliction of emotional distress ("IIED") and creates a private right of action for wrongful death.  *See* California Code of Civil Procedure §§ 377.60–377.62.  The Court analyzes her claim below.

Case 1:16-cv-02193-EGS-ZMF   Document 86   Filed 09/08/22   Page 23 of 41

D.    <u>Damages</u>

The FSIA allows recovery for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Other than punitive damages, each type of recovery under § 1605A(c) is limited to a certain category of plaintiffs. First, damages for pain and suffering are limited to injured U.S. servicemembers and, if death was not instantaneous, to the estates[10] of deceased U.S. servicemembers. *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 73–74 (D.D.C. 2008). Second, economic damages are limited to U.S. servicemembers and their estates for their economic losses. *See Valore*, 700 F. Supp. 2d at 83. Finally, solatium damages are limited to the immediate family members of victims.[11] *See id.* at 85.

To recover damages against Iran, Plaintiffs "must prove that the consequences of [Iran's] conduct w[as] reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate." *Salazar*, 370 F. Supp. 2d at 115–16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted)).

1.    *Pain and suffering*

a.    Claims by Attack Victims

Three surviving victims—SPC Hanley, SPC Evans, and CPL Montalbano—seek damages for pain and suffering. *See* Mot. for Default J. at 117–18. "Damages for surviving victims are

---

[10] "The estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *W.A.*, 427 F. Supp. 3d at 138 (quoting *Braun*, 228 F. Supp. 3d at 78–79). Two estates of deceased victims are plaintiffs in this case: 1) the estate of SPC Neiberger, which is administered under Florida law; and 2) the estate of SPC Reeves, which is administered under Kansas law. *See id.* Both states recognize survivorship actions. *See* Fla. Stat. Ann. § 46.021; Kansas Stat. Ann. § 60-1901(a). Thus, both estates have established their standing to sue on the victim's behalf.

[11] "Solatium" is defined as "[c]ompensation; esp., damages allowed for hurt feelings or grief, as distinguished from damages for physical injury." *Solatium*, Black's Law Dictionary (11th ed. 2019).

determined based upon an assessment of such factors as 'the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life.'" *Valore*, 700 F. Supp. 2d at 83–84 (quoting *Peterson v. Islamic Republic of Iran* (*Peterson II*), 515 F. Supp. 2d 25, 52 n.26 (D.D.C. 2007)).  "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards."  *Peterson II*, 515 F. Supp. 2d at 54, *abrogated on other grounds by Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.C. Cir. 2015).

This district has established a damages framework for pain and suffering suffered by attack victims in FSIA cases.  *See Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019).  This framework establishes a baseline award of $5 million, which may be adjusted either upward or downward depending on the circumstances. *See id.*  An upward departure may be warranted "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead."  *Valore*, 700 F. Supp. 2d at 84.  A downward departure may be warranted "where victims suffered only minor shrapnel injuries or minor injury from small-arms fire."  *Id.*  As to departure amounts, this Court has previously awarded $7 million or more to plaintiffs who suffer relatively more severe injuries and awarded an amount closer to $1.5 million to plaintiffs whose injuries are relatively less severe.  *See Owens*, 71 F. Supp. 3d at 259.

i.   Upward Departure

On March 29, 2008, SPC Hanley was injured when his Humvee was struck by an EFP.  *See* Patrick Hanley Decl. (Ex. 47) ¶ 8, ECF No. 76-4.  SPC Hanley was immediately transported to an emergency medical unit, where a neurosurgeon removed part of his skull to relieve the pressure

on his brain caused by swelling from blood pooling and bleeding in his brain. *See id.* ¶ 11. SPC Hanley was then put in a medically induced coma for five weeks to relieve cranial pressure and combat the infection in his brain. *See id.* ¶ 12. Once conscious, he suffered tremendous nausea related to the opening of his skull and long-term exposure of his brain, resulting in his inability to eat and dramatic weight loss from 210 to 128 pounds. *See id.* ¶ 15. After the installation of a titanium plate over the opening of his skull, SPC Hanley worked to regain his cognitive and physical functioning as he alternated between care facilities. *See id.* ¶¶ 16, 19. Aside from his brain injuries, SPC Hanley's left arm was amputated, and he experienced substantial and permanent vision impairment. *See id.* ¶ 13. The length and severity of the treatment for SPC Hanley's brain injury and arm amputation, as well as the permanent impact on his health, warrants a $2.5 million upward departure to $7.5 million total. *See Valore*, 700 F. Supp. 2d at 84 (granting upward departure of $2.5 million to $7.5 million to serviceman who experienced "particularly horrendous physical injuries, in both number and severity," involving his regaining consciousness after attack to find severe wounds through his chest, his leg split open, his clothes blown off, and burns covering 90% of his body).

ii.    Departure Unwarranted

On October 12, 2009, an array of EFPs injured SPC Evans. *See* Evans Decl. (Ex. 71) ¶¶ 5–7, ECF No. 76–4. SPC Evans "sustained injuries to [his] face, throat, left arm, left hip, left leg, and testicles." *Id.* ¶ 9. SPC Evans underwent jaw surgery, treatment to his left eye socket, and an experimental limb salvage operation to regrow parts of his leg bones, resulting in one leg being slightly longer than the other. *See id.* ¶ 10. SPC Evans suffers ongoing back, ankle, foot, and knee pain and requires surgery to remove dead/damaged ankle tissue every few years. *See id.* ¶¶ 10–11. SPC Evans further suffered from temporary fertility issues related to the loss of his testicle

and the formation of surrounding scar tissue.  *See id.* ¶ 12.  Although Evans continued to deal with insomnia related to his injuries and to undergo regular surgeries, he has also started a family and began pursuing a PhD in Neuroscience at Stanford University.  *See id.* ¶¶ 13–14.  Given the extent of SPC Evan's physical and mental injuries, the Court recommends awarding damages of $5 million dollars to SPC Evans for his pain and suffering.  *See, e.g.*, *Peterson II*, 515 F. Supp. 2d at 52 n.26. (granting the $5 million baseline award to victims who experienced compound fractures, severe flesh wounds, injuries from shrapnel, and "lasting and severe psychological pain").

### iii.    Downward Departure

On April 28, 2008, CPL Montalbano jumped from a rooftop to escape direct fire and suffered a back injury on impact.  *See* Mot. for Default J. at 46–49.  CPL Montalbano did not require hospitalization or seek immediate medical treatment but testified that he was unable to walk immediately after the injury.  *See id.* at 154–55.  According to CPL Montalbano, this injury led to a herniated disk, hearing loss, tinnitus, post-traumatic stress disorder ("PTSD"), depression, and long-term issues with his balance.  *See id.* at 155; Montalbano Decl. ¶ 20.  The Court has an obligation "to ensure that individuals with similar injuries receive similar awards."  *Peterson II*, 515 F. Supp. 2d at 54.  Because CPL Montalbano's back injury was dramatically less severe than the other surviving victims' injuries and did not require immediate medical treatment, the Court recommends reducing the baseline award to $1.5 million.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 84–85 (departing downward to 1.5 million where service member "lack[ed] . . . severe physical injuries").

### b.    Claim by an Estate

"For periods of pain and suffering of a less than a minute to a few hours after an attack but prior to death, courts have awarded damages of $1,000,000."  *Braun*, 228 F. Supp. 3d at 83; *see*

*also Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hours). However, "a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death." *Roth*, 78 F. Supp. 3d at 402.

The estate for decedent SPC Reeves seeks damages for pain and suffering prior to his death. *See* Mot. for Default J. at 137–38.  On September 22, 2007, SPC Reeves was in the first Humvee of a four-Humvee convoy during an operation when an EFP struck his vehicle. *See*Dep't of the Army, USARCENT FOIA FA-18-0121 - Report of Investigation UP AR 15-6 (Ex. 111) at 15, 37 (2007), ECF No. 76-8.  SPC Reeves suffered the loss of his left foot and shrapnel wounds to his abdomen, lower pelvis, right forearm, and buttock. *Id.* at 9.  *Washington Post* reporter David Finkel was with SPC Reeves's unit at the time and provided a first-hand account of the attack: "when the EFP exploded . . . [Reeves] wasn't breathing, his eyes weren't moving, his left foot was gone, his back side was ripped open, his face had turned gray, his stomach was filling with blood." *See* David Finkel, The Good Soldiers (Sarah Crichton Books, 1st ed. 2009).  An interpreter that had been in the second Humvee when the EFP went off later recalled that she "had run to the first Humvee, had crawled inside until she was wedged next to Reeves, and had seen him pass out and go white." *See id.*  About ten minutes after the attack, SPC Reeves was still alive, but recorded as "unconscious and pulseless."  Mot. for Default J. at 25.  Medics pronounced SPC Reeves dead one hour and twenty-one minutes after the attack.  *See id.*

This evidence suggests that SPC Reeves was not killed instantaneously and was—even momentarily—conscious from the time of the attack until the interpreter was able to run to his vehicle and witness him lose consciousness.  *See* Finkel, *supra*.  The Court recommends awarding

$1,000,000 in damages to the estate of SPC Reeves for his pain and suffering in the moments prior to his loss of consciousness. *See Braun*, 228 F. Supp. 3d at 83 (awarding $1,000,000 to estate of victim who "suffered being thrown into the air and an impact that caused her head to become smashed and her to begin vomiting and that she survived for two hours after the [a]ttack, during which time she was attended to by medical personnel").

2.    <em>Economic Damages</em>

Plaintiffs who survived the attacks and the estates of deceased victims may seek economic damages. *See Owens*, 71 F. Supp. 3d at 258; *see Valore*, 700 F. Supp. 2d at 82 (finding Iranian government "liable for the economic damages caused to decedents' estates"). Economic damages include past and future lost wages, benefits and retirement pay, and other out-of-pocket expenses. *See Owens*, 71 F. Supp. 3d at 258. A plaintiff must provide evidentiary support to obtain economic damages. *See Moradi*, 77 F. Supp. 3d at 71. Traditionally, plaintiffs submit a forensic economist's expert report to establish economic losses. *See, e.g.*, *Roth*, 78 F. Supp. 3d at 402; *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 59–60 (D.D.C. 2018); *Valore*, 700 F. Supp. 2d at 83. When evaluating an expert's report, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)).

SPC Neiberger's and SPC Reeves's estates have submitted expert reports establishing their economic losses prepared by Chad L. Staller, President and Senior Economist at the Center for Forensic Economic Studies ("CFES"), and Stephen M. Dripps, Senior Economist and Statistician at CFES. These expert reports calculate each decedent's lost wages, benefits, and retirement pay. *See* Neiberger Report, ECF No. 76-3; Reeves Report, ECF No. 76-3. This Court has previously found similar calculations prepared by CFES in FSIA cases to be "reasonable," "consistent with

generally accepted practices," and calculated using "appropriate assumptions based on reasonable and well-documented sources." *Fritz*, 324 F. Supp. 3d at 59–60; *see also Roth*, 78 F. Supp. 3d at 404–05 (accepting CFES report to award economic damages in FSIA case). The reports model two scenarios; one computing loss until the end of the "statistical worklife" as determined by each decedent's age and level of education, and one computing loss until the later social security retirement age. *See* Neiberger Report at 3; Reeves Report at 3. Given "[c]urrent trends indicating that individuals are more likely to work beyond the average work life," courts in this District have previously opted for the social security retirement age because it yields a later retirement age. *See, e.g.*, *Fritz v. Islamic Republic of Iran*, No. 15-cv-456, 2018 WL 5046229, at *17 (D.D.C. Aug. 13, 2018), *report and recommendation adopted by* 324 F. Supp. 3d 54 (D.D.C. 2018). This Court likewise recommends awarding an amount of economic damages based on social security retirement age, resulting in economic damages to SPC Neiberger's estate in the amount of $1,343,726 and to SPC Reeves's estate in the amount of $2,108,553.

CPL Montalbano seeks $13,000 in economic damages stemming from his therapeutic injection treatment. *See* Montalbano Decl. ¶ 24. CPL Montalbano's insurance refused to pay for this treatment due to its experimental nature. *See id.* This Court recommends denying CPL Montalbano's claim because he did not provide any evidentiary support for the amount identified in his declaration. *See Moradi*, 77 F. Supp. 3d at 71 (declining to award economic damages where plaintiff provided no evidentiary support outside of own declaration).

### 3.    *Solatium*

Plaintiffs are seeking IIED damages either under § 1605A(c) or California state law. Under § 1605A(c), a solatium claim is indistinguishable from an IIED claim. *See Valore*, 700 F. Supp. 2d at 83; *Est. of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 27 n.4. (D.D.C.

2009).   A § 1605A(c) solatium claim is viable if: "(1) [plaintiffs] are members of a victim's immediate family," and (2) "the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019) (cleaned up) (citing Restatement (Second) of Torts § 46).   Unlike traditional IIED claims, "[o]ne . . . need not be present at the time of a terrorist attack upon a third person to recover [under § 1605A(c)] for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80.   This exception is unique to acts of terrorism because "the 'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'etre*." *Heiser II*, 659 F. Supp. 2d at 27 (quoting *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)).   Indeed, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).   As such, the extreme-and-outrageous-conduct prong is satisfied.   *See id.*   Therefore, the only question for the Court concerns the familial relationship.

"[T]he loss suffered" by family members of victims "is undeniably difficult to quantify." *Heiser*, 466 F. Supp. 2d at 269.   Courts in this District have adopted the framework set forth in *Heiser* as "an appropriate measure of damages for the family members of victims." *Peterson II*, 515 F. Supp. 2d at 51; *see, e.g.*, *Valore*, 700 F. Supp. 2d at 85 (applying the *Heiser* framework); *Brewer*, 664 F. Supp. 2d  at 57–58 (same); *Heiser II*, 659 F. Supp. 2d at 27 n.4 (same).

> That framework awarded valid claims brought by spouses, parents, and siblings of deceased servicemen $8 million, $5 million, and $2.5 million each, respectively. Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased: $4 million for spouses, $2.5 million for parents, and $1.25 million for siblings.

*Valore*, 700 F. Supp. 2d at 85.   "These numbers, however, are not set in stone." *Id.*

Upward departures in solatium damages "are typically reserved for cases with aggravating circumstances." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006). A court may consider "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Id.* at 26. "Such departures are usually relatively small, absent 'circumstances that appreciably worsen' a claimant's 'pain and suffering, such as cases involving torture or kidnapping' of the party to whom extreme and outrageous conduct was directed." *Valore*, 700 F. Supp. 2d at 84–86 (quoting *Greenbaum*, 451 F. Supp. 2d at 108) (departing solatium damages upward by 25 percent for siblings of victims under aggravating circumstances).

"Conversely, downward departures may be appropriate where the evidence suggests that the relationship between the victim and his family members is attenuated or where a claimant fails to 'prove damages in the same manner and to the same extent as any other default winner.'" *DiBenedetto v. Islamic Republic of Iran*, No. 16-cv-2429, 2020 WL 820877, at *3 (D.D.C. Feb. 19, 2020) (quoting *Hill*, 328 F.3d at 683) (internal citation omitted).

### a.     No Immediate Family Relation

"The 'immediate family' requirement is strictly construed in FSIA cases; . . . only spouses, parents, siblings, and children are entitled to recover." *Roth*, 78 F. Supp. 3d at 400. The statute does not include nieces, nephews, aunts, uncles, non-adoptive stepparents, or non-adopted

stepchildren. *See Heiser II*, 659 F. Supp. 2d at 28–29.  "Courts must draw [this] line to avoid 'such an expansive and indefinite scope of liability.'"  *Borochov v. Islamic Republic of Iran*, No. 19-cv-2855, 2022 WL 656168, at *17 (D.D.C. Mar. 4, 2022) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15 (D.D.C. 2012)).

Plaintiff Jessica Farley is the daughter-in-law of the deceased Mr. Farley.  There is no precedent to support treating a daughter-in-law as an immediate family member or evidence to suggest that such designation is warranted here.  *See Heiser II*, 659 F. Supp. 2d at 28–29.  Although Ms. Farley was close with her father-in-law, "[t]he mere existence of a 'close relationship' between a claimant who is a non-immediate family member and the victim . . . falls 'far short of what [an IIED claim] requires.'"  *Valore*, 700 F. Supp. 2d at 79 *(*quoting *Bettis*, 315 F.3d at 337).  The Court therefore recommends denying solatium damages to Ms. Farley.

b.   Upward Departures

SPC Hanley was severely injured in an EFP attack, resulting in brain injury and the loss of his arm.  *See* Mot. for Default J. at 29.  Katherine and Edward Hanley endured the "excruciating" aftermath of SPC Hanley's attack, during which they were not allowed to visit with or touch SPC Hanley due to his brain infection.  *See* Edward Hanley Decl. (Ex. 49) ¶ 6, ECF No. 76-4.  The family experienced prolonged distress during SPC Hanley's treatment, when "Patrick could barely sit up except to throw up . . . [and h]is weight fell from over 200 pounds []to 128 pounds."  *Id.* ¶ 7.  Cecelia Hanley was hospitalized overnight due to a stress-induced panic attack, which she had never experienced before SPC Hanley's attack.  Cecelia Hanley Decl. (Ex. 53) ¶ 8.  Further, Edward and Katherine Hanley continue to "organize [their] lives around Patrick and his needs, which can be demanding."  *Id.* ¶ 10.  SPC Hanley's parents "will receive upward departures based on the extraordinary circumstances they endure, living with, and caring for, their injured service

member [child]."  *Schooley*, 2019 WL 2717888, at *78 (awarding additional sum of $1,500,000 in solatium damages to parents who provide ongoing care to their injured service member children). The Court therefore recommends awarding Edward and Katherine Hanley each a $1,500,000 (or 60%) upward departure in solatium damages to $4,000,000.  *See id.*  For the same reasons, the Court further recommends awarding Cecelia Hanley a $750,000 (or 60%) upward departure in solatium damages to $2,000,000.  *See id.*

Ms. Teresita Davis worked alongside her son as a medic in Iraq and, consequently, saw his corpse first-hand at the morgue after his death.  *See* Teresita Davis Decl. (Ex. 79) ¶ 9, ECF No. 76-3.  Ms. Davis began seeing a counselor after SPC Davis's death.  *See id.* ¶ 11.  After two years of counseling, Ms. Davis attempted suicide.  *See id.*  This tragedy led to a 10-day hospitalization and her diagnoses with PTSD and severe depression.  *See id.* ¶ 14.  Ms. Davis attempted to return to work in Iraq as a medic but left after experiencing emotional distress at the sight of young men with injuries like SPC Davis's.  *See id.* ¶ 10.  Among SPC Davis's five family members who bring claims, "[Ms. Davis's] emotional suffering stands out as particularly devastating."  *Valore*, 700 F. Supp. 2d at 86 (awarding a 25% upward departure where a plaintiff "suffered several nervous breakdowns, at least one of which required hospitalization").  Thus, the Court recommends a 25% upward departure in solatium damages to $6,250,000 for Ms. Davis.

### c.    Downward Departure

Deborah Wilson, mother of CPL Montalbano, seeks elevated solatium damages of $3,500,000 related to her son's injury.  "Solatium is awarded to compensate the 'the mental anguish, bereavement, and grief that those with a close personal relationship to a [victim] experience as the result of the [victim]'s death [or injury].'"  *Valore*, 700 F. Supp. 2d at 85 (quoting *Belkin*, 667 F. Supp. 2d at 22).  CPL Montalbano's back injury was relatively less severe and of

shorter duration than the injuries suffered by other victims in this case such that it did not require medical treatment. *See supra*. Thus, Ms. Wilson has not "prove[n] damages [for loss of solatium] in the same manner and to the same extent as any other default winner." *Hill*, 328 F.3d at 683. For the same reasons as CPL Montalbano's 70% downward departure in damages for pain and suffering, the Court recommends awarding Ms. Wilson solatium damages departed downward by 70% to $750,000. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998)) ("[T]he [solatium] calculation should be based upon the anticipated duration of the injury.").

d.    Departures Unwarranted

Each remaining plaintiff is an immediate family member of one of the victims and testified to the strength of their individual relationship with the respective victim and the profound feelings of loss brought on by their death. *See Mot. for Default J. at 125–78. See id.* For plaintiffs bringing a claim under § 1605A, this Court "presume[s] that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish." *Roth*, 78 F. Supp. 3d at 403 (citing *Flatow*, 999 F. Supp. at 30). Further, each sibling bringing a claim has satisfied the requirement to provide "testimony proving a close emotional relationship." *Id.* While these testimonials satisfy the threshold for baseline damages, they do not include evidence of the type of "aggravating circumstances that appreciably worsen the [claimant]'s pain and suffering." *Greenbaum*, 451 F. Supp. 2d at 108. "The Court's awards are driven by a recognition that most—if not all—people eligible for *Heiser*-type compensation have endured the unimaginable, and that fine distinctions in awards based on outward manifestations of grief may unintentionally slight those whose grief is no less real but is more internalized." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021). Accordingly, the Court recommends awarding solatium damages in conformity with the *Heiser* framework for these remaining plaintiffs in accordance with Exhibit A.

34

e.      California State Claim

As noted above, Ms. Moncada is ineligible to bring her claim under § 1605A(c) and instead brings a California state IIED claim.  Under California law, the elements of IIED are: "(1) extreme and outrageous conduct by the defendant with the intent to cause, or with reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffering severe or extreme emotional distress; and (3) the defendant's conduct is the actual and proximate cause of the plaintiff's emotional distress."  *Heiser*, 466 F. Supp. 2d at 305 (citing *Davidson v. City of Westminster*, 649 P.2d 894, 901 (1982)).  The plaintiff's presence is "deemed unnecessary in situations where the defendant is aware of the high probability that the defendant's acts will cause a plaintiff severe emotional distress."  *Id.* (citing *Christensen v. Superior Ct.*, 820 P.2d 181, 203–04 (1992)).  Thus— as with § 1605A(c)—"in the case of a terrorist attack as this, the Court finds that the presence element does not need to be proven in order to successfully bring a cause of action for [IIED] under California law."  *Id.*  Further, this Court has determined that providing material support for terrorism is extreme and outrageous conduct under California law.  *See Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 129 (D.D.C. 2007).  Therefore, this Court need only assess whether Iran's conduct caused Ms. Moncada severe emotional distress.

The horrific EFP attack that killed SGT Moncada—precipitated by Iran's material support and resources—brought extreme emotional distress to Ms. Moncada as defined by California state law.  *See, e.g.*, *id.* (granting California IIED claim to family member of daughter killed in terrorist attack); *see* Mot. for Default J. at 34–38.  Ms. Moncada "remembers screaming and crying the day she received the news that her son had been killed" and "was overcome with so much mental anguish that she wanted to throw herself from a mountain."  *See* Obdulia Moncada Decl. (Ex. 63) ¶ 6, ECF No. 76-4.  The Court recommends awarding Ms. Moncada the *Heiser* baseline amount

of $5,000,000 for the parent of a deceased service member.  *See Bennett*, 507 F. Supp. at 129–30

(awarding *Heiser* framework damages pursuant to California IIED claim).

>    4.    *Prejudgment Interest*

Plaintiffs next seek prejudgment interest on their compensatory damages.  *See* Mot. for

Default J. at 123–24.  "Whether to award such interest is a question that rests within this Court's

discretion, subject to equitable considerations."  *Oveissi v. Islamic Republic of Iran*, 879 F. Supp.

2d 44, 58 (D.D.C. 2012) (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp.

2d 216, 263 (D.D.C. 2008)).   In the context of FSIA, judges in this district have recently

"concluded that prejudgment interest [is] appropriate on both 'past economic loss' and on the 'non-

economic pain and suffering and solatium damages suffered by the victims' estates and families.'"

*Force v. Islamic Republic of Iran*, No. 16-cv-1468, 2022 WL 2965635, at *12 (D.D.C. July 27,

2022) (quoting *Fritz*, 324 F. Supp. 3d at 64); *see also Cabrera v. Islamic Republic of Iran*, No. 18-

cv-2065, 2022 WL 2817730, at *55 (D.D.C. July 19, 2022) (awarding prejudgment interest to

compensatory damages).

The Court will calculate that interest using the average annual prime rate in each year from

the date of the attack in accordance with the following procedure:

> To calculate the multiplier, the Court multiplied $1.00 by the prime
> rate in 1983 (10.79%); discounted that interest by the percentage of
> the year left from April 18, 1983, to December 31, 1983 (70.4%);
> and then added that amount to $1.00—yielding $1.07596. Then, the
> Court took that amount and multiplied it by the prime rate in 1984
> (12.04%) and added that amount to $1.07596, yielding $1.205506.
> The Court continued this iterative process through June 10, 2020,
> resulting in a total multiplier of 10.62015. For 2020, the Court
> estimated the rate to be 4.05167%—the average for the past six
> years—and again discounted the interest by the percentage of the
> year that has elapsed to date (44.2623%).

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 n.13 (D.D.C. 2020) (internal citation

omitted); *see also Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 83 n.10 (D.D.C. 2014); *Fritz*,

324 F. Supp. 3d at 64 n.2.  Pre-judgment interest shall not apply to the economic damages awarded to SPC Neiberger or SPC Reeves given that the expert reports already include estimates on present value.  *See* Mot. for Default J. at 144.  Exhibit A details the pre-judgement interest payment amounts assuming a judgment date of September 30, 2022.  *See* Ex. A.

     5.    *Punitive*

Finally, all plaintiffs seek punitive damages.[12]  *See* Mot. for Default J. at 120.  In determining the amount of punitive damages, courts consider the following four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (citing *Flatow*, 999 F. Supp. at 32).  In sum, punitive damages are warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others."  *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011).  As to the first two factors, the Court has already concluded that Iran "supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized" JAM and AQI—"known terrorist organization[s]"—in the form of weapons, training, safe haven, planning, and financing to JAM fighters.  *Braun*, 228 F. Supp. 3d at 86; *see supra*. These actions resulted in harm to innocent people in a nature that is "the most heinous."  *Valore*, 700 F. Supp. 2d at 87–88.  As to the third factor, given Iran's "longstanding pattern and policy" supporting terrorist organizations that aim to harm Americans, "the need for deterrence [is] clear."

---

[12] Punitive damages are available under the FSIA, even for attacks that preceded the 2008 amendment to the FSIA providing for punitive damages.  *See Opati*, 140 S. Ct. at 1608.

*Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017).  Finally, "Iran is a

sovereign and has substantial wealth."  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25

(D.D.C. 2016).  The Court is thus persuaded that Plaintiffs are entitled to punitive damages.  *See,*

*e.g.*, *Selig*, 573 F. Supp. 3d at 75.

Several approaches have been articulated to calculate the amount of punitive damages:

- an amount equal to compensatory damages, *see, e.g.*, *Moradi*, 77 F. Supp. 3d at 73; *Selig*,
  573 F. Supp. 3d at 75;

- a multiple of the amount of compensatory damages, *see, e.g.*, *Gill*, 249 F. Supp. 3d at 105;

- a multiple of the amount of the foreign state's annual funding of terrorism, *see, e.g.*, *Braun*,
  228 F. Supp. 3d at 87; *Valore*, 700 F. Supp. 2d at 89; and

- a fixed amount per affected family, *see, e.g.*, *Gates*, 580 F. Supp. 2d at 75; *Colvin v. Syrian*
  *Arab Republic*, 363 F. Supp. 3d 141, 163–64 (D.D.C. 2019).

In reaching an amount of punitive damages, courts must balance the need to deter "the brutal

actions of defendants in planning, supporting and aiding the execution of [terrorist attacks],"

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 184 (D.D.C. 2010), with the concern that

"[r]ecurrent awards in case after case arising out of the same facts can financially cripple a

defendant, over-punishing the same conduct through repeated awards with little deterrent effect,"

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51,79 (D.D.C. 2010).

Plaintiffs here base their request for $1.5 billion in punitive damages which is based on

"Iran's average annual support for terrorism during the relevant period multiplied times five."  *See*

Mot. for Default J. at 122.  Plaintiffs rely primarily on *Valore*, where the Court multiplied Iran's

estimated terrorism financing by five based on a "suggestion by [the testifying expert] that Iran

[began in the years prior to 2008] to more actively participate in litigation in the United States and

elsewhere." *Valore*, 700 F. Supp. 2d at 89.  Plaintiffs have not made such a suggestion here.  Indeed, courts have since noted the "'the lack of any evidence that high awards have successfully deterred' Iran." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *21 (D.D.C. July 2, 2020) (quoting *Bluth*, 203 F. Supp. 3d at 26).

Plaintiffs assert that the $1.5 billion award can also be reached by awarding $150 million to each victim's family.  *See* Mot. for Default J. at 123.  However, such award "would result in a colossal figure, given the number of families involved." *Opati*, 60 F. Supp. 3d at 81.  Courts have only awarded such amounts in the most repugnant and premeditated of attacks.  *See, e.g.*, *Gates*, 580 F. Supp. 2d at 74–75 (awarding $150 million in punitive damages against Syria to both families of two beheaded civilian contractors, the videos of which "glorified cruelty and fanned the flames of hatred, in a fundamental offense to human dignity").  The circumstances of the attacks in this case do not similarly warrant a fixed award per family.

Instead, this Court finds that the most sensible amount of punitive damages here is a sum equivalent to compensatory damages.  *See Moradi*, 77 F. Supp. 3d at 73.  This method "has the virtue of straightforwardly scaling as additional sets of plaintiffs come forward . . . and is both 'consistent with the punitive damage awards in analogous cases' and a forceful deterrent against Iran's further support of terrorist organizations." *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 273 (D.D.C. 2020) (quoting *Opati*, 60 F. Supp. 3d at 82).  The punitive award amount shall incorporate prejudgment interest, such that "the Court can ensure that the punitive-damage multiplier applies to the entire compensatory loss and that the happenstance of when judgment is entered does not have a material effect on the ultimate value of the judgment." *Force*, 2022 WL 2965635, at *12.  Exhibit A attached details this Court's damages findings.

III.    **CONCLUSION**

For the reasons states above, the Court recommends GRANTING Plaintiffs' Motion for Default Judgment as to liability and GRANTING IN PART and DENYING IN PART Plaintiffs' Motion as to damages in accordance with the findings herein.

IV.    **REVIEW BY THE DISTRICT COURT**

Under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

Date: September 8, 2022

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

**Exhibit A**

| Plaintiff | Relative of | Compensatory | | | | Punitive | Total |
|---|---|---|---|---|---|---|---|
| | | Pain and Suffering | Solatium | Prejudgment Interest* | Economic | | |
| Pamela Thrall (sister) | Rod Richardson | | 2,500,000 | 1,636,892 | | 4,136,892 | $8,273,785 |
| Kathleen Stephens (mother) | Blake Stephens | | 5,000,000 | 3,036,678 | | 8,036,678 | $16,073,356 |
| Trent Stephens (father) | Blake Stephens | | 5,000,000 | 3,036,678 | | 8,036,678 | $16,073,356 |
| Summer Stephens (sister) | Blake Stephens | | 2,500,000 | 1,518,339 | | 4,018,339 | $8,036,678 |
| Rhett Stephens (brother) | Blake Stephens | | 2,500,000 | 1,518,339 | | 4,018,339 | $8,036,678 |
| Brittani Hobson (sister) | Blake Stephens | | 2,500,000 | 1,518,339 | | 4,018,339 | $8,036,678 |
| Derek Stephens (brother) | Blake Stephens | | 2,500,000 | 1,518,339 | | 4,018,339 | $8,036,678 |
| Chris Neiberger Estate (victim) | Self | | | 0 | 1,343,726 | 1,343,726 | $2,687,452 |
| Mary Neiberger (mother) | Christopher Neiberger | | 5,000,000 | 2,937,432 | | 7,937,432 | $15,874,863 |
| Richard Neiberger (father) | Christopher Neiberger | | 5,000,000 | 2,937,432 | | 7,937,432 | $15,874,863 |
| Ami Neiberger (sister) | Christopher Neiberger | | 2,500,000 | 1,468,716 | | 3,968,716 | $7,937,432 |
| Robert Neiberger (brother) | Christopher Neiberger | | 2,500,000 | 1,468,716 | | 3,968,716 | $7,937,432 |
| Eric Neiberger (brother) | Christopher Neiberger | | 2,500,000 | 1,468,716 | | 3,968,716 | $7,937,432 |
| Joshua Reeves Estate (victim) | Self | 1,000,000 | | 577,121 | 2,108,553 | 3,685,674 | $7,371,347 |
| Leslie Hardcastle (widow) | Joshua Reeves | | 8,000,000 | 4,616,964 | | 12,616,964 | $25,233,929 |
| J.R., a minor (son) | Joshua Reeves | | 5,000,000 | 2,885,603 | | 7,885,603 | $15,771,205 |
| W. Jean Reeves (mother) | Joshua Reeves | | 5,000,000 | 2,885,603 | | 7,885,603 | $15,771,205 |
| James Reeves (father) | Joshua Reeves | | 5,000,000 | 2,885,603 | | 7,885,603 | $15,771,205 |
| Jared Dillon Reeves (brother) | Joshua Reeves | | 2,500,000 | 1,442,801 | | 3,942,801 | $7,885,603 |
| Joni Ariel Reeves Little (sister) | Joshua Reeves | | 2,500,000 | 1,442,801 | | 3,942,801 | $7,885,603 |
| Sherri C. Hoilman (sister) | Joshua Reeves | | 2,500,000 | 1,442,801 | | 3,942,801 | $7,885,603 |
| Patrick Hanley (victim) | Self | 7,500,000 | | 4,070,163 | | 11,570,163 | $23,140,326 |
| Katherine Hanley (mother) | Patrick Hanley | | 4,000,000 | 2,170,754 | | 6,170,754 | $12,341,507 |
| Edward Hanley (father) | Patrick Hanley | | 4,000,000 | 2,170,754 | | 6,170,754 | $12,341,507 |
| Cecelia Hanley (sister) | Patrick Hanley | | 2,000,000 | 1,085,377 | | 3,085,377 | $6,170,754 |
| Samuel Montalbano | Self | 1,500,000 | | 807,774 | | 2,307,774 | $4,615,549 |
| Deborah Wilson (mother) | Samuel Montalbano | | 750,000 | 403,887 | | 1,153,887 | $2,307,774 |
| Obdulia Moncada (mother) | Raul Moncada | | 5,000,000 | 2,474,973 | | 7,474,973 | $14,949,945 |
| Priscila Moncada (daughter) | Raul Moncada | | 5,000,000 | 2,474,973 | | 7,474,973 | $14,949,945 |
| Miriam Lopez (sister) | Raul Moncada | | 2,500,000 | 1,237,486 | | 3,737,486 | $7,474,973 |
| Alexandra Aguilar (sister) | Raul Moncada | | 2,500,000 | 1,237,486 | | 3,737,486 | $7,474,973 |
| Daniela Moncada (sister) | Raul Moncada | | 2,500,000 | 1,237,486 | | 3,737,486 | $7,474,973 |
| Matthew Moncada (brother) | Raul Moncada | | 2,500,000 | 1,237,486 | | 3,737,486 | $7,474,973 |
| Stephen Evans (victim) | Self | 5,000,000 | | 2,393,945 | | 7,393,945 | $14,787,890 |
| Guy L. Davis (father) | Steven Davis | | 5,000,000 | 2,973,822 | | 7,973,822 | $15,947,644 |
| Teresita R. Davis (mother) | Steven Davis | | 6,250,000 | 3,717,277 | | 9,967,277 | $19,934,555 |
| E.D. (child) | Steven Davis | | 5,000,000 | 2,973,822 | | 7,973,822 | $15,947,644 |
| Ayla Davis (spouse) | Steven Davis | | 8,000,000 | 4,758,115 | | 12,758,115 | $25,516,230 |
| Chris Davis (brother) | Steven Davis | | 2,500,000 | 1,486,911 | | 3,986,911 | $7,973,822 |
| Jessica Farley (daughter-in-law) | Steven Farley | | 0 | | | 0 | $0 |
| **Total** | | $15,000,000 | $128,000,000 | $81,156,404 | $3,452,279 | $227,608,683 | $455,217,367 |

*Prejudgment interest assumes a judgment date of 9/30/2022